**NATIONAL LABOR RELATIONS BOARD
v. GLOBE WIRELESS, Limited.**

No. 12736.

United States Court of Appeals,
Ninth Circuit.

Dec. 27, 1951.

George J. Bott, Gen. Counsel, David P. Findling, Asso. Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Frederick U. Reel, Albert M. Dreyer, Attorneys, NLRB, all of Washington, D. C., for petitioner.

Gregory A. Harrison, Richard Ernst, Malcolm T. Dungan and Brobeck, Phleger & Harrison, all of San Francisco, Cal., for respondent.

Before HEALY and POPE, Circuit Judges and LEMMON, District Judge.

HEALY, Circuit Judge.

This matter is before us on petition of the National Labor Relations Board for enforcement of an order requiring respondent to reinstate a group of 19 employees found by the Board to have been discriminatorily discharged.

Respondent is engaged in the transmission of international radio communications. On January 21, 1949, it discharged for insubordination one Jones, an employee who was a member of and active in the American Communications Association, a labor organization, referred to in the briefs as ACA.[1] Jones then attended an ACA meeting for members employed on the afternoon watch, and the members voted to protest his discharge. Shortly after the shift went on duty a protest was lodged with Bash, respondent's chief operator. The union members on duty gathered round Bash and were told by the latter to get back to their circuits. They refused. Bash reported to McPherson, respondent's district manager, and on orders from the latter Bash again asked each operator to return to work. Each said he would do so only if Jones were reinstated. Bash then told them they were discharged. The

---

1. The ACA had failed to comply with the provisions of § 9(f, g), and (h) of the National Labor Relations Act, 29 U.S. C.A. § 159(f–h). The respondent claims that the charges filed with the Board were presented by the non-complying Union. However, it appears on the face of the charges that they were filed by the individual employees concerned. As said in N. L. R. B. v. Augusta Chemical Co., 5 Cir., 187 F.2d 63, 64, "Granted that the disqualified union was active in assisting, indeed in directing, the employees in preparing their charges, it does not at all follow that the employees, by accepting that assistance, disqualified themselves." To the same effect, see N. L. R. B. v. Clausen, 3 Cir., 188 F.2d 439, 444; W. T. Rawleigh Co. v. N. L. R. B., 7 Cir., 190 F.2d 832, 836.

operators came to the district manager, who confirmed their discharge but offered them the opportunity to go back to work. They repeated the demand that Jones be reinstated as a condition to resuming work, and the manager told them they were discharged. Thereupon the operators at once left respondent's premises. When the members of the midnight watch came on duty they likewise voted to protest Jones' discharge, and the afternoon pattern of conduct repeated itself in almost identical fashion. Later, three other employees who had not been on either shift at the time of the earlier occurrences were discharged under substantially similar circumstances. A few days afterwards all the operators in question received through the mails a final paycheck and a form of notice of termination of employment.

1. The trial examiner found, as did the Board, that the protest strike was an economic strike, that is, not one brought on by unfair labor practices, since Jones' discharge was for cause. The examiner was of opinion that respondent did not violate the Act by discharging the men.[2] The Board disagreed, holding that while respondent was free to replace the strikers at any time prior to their unconditional request for reinstatement it was not free to discharge them *before* their places had been filled. It concluded that the discharges in advance of the employees' having been replaced were in violation of § 8(a)(1) and (3) of the Act, 29 U.S.C.A. § 158(a)(1, 3).

■■ We think the Board was correct in its application of the law to the facts of the case. By striking in protest against the discharge of Jones the operators clearly engaged in a concerted activity for "mutual aid or protection" within the intendment of § 7 of the Act, 29 U.S.C.A. § 157. N. L. R. B. v. Peter C. K. Swiss Choc. Co., 2 Cir., 130 F.2d 503, 505; Carter Carburetor Corp. v. N. L. R. B., 8 Cir., 140 F.2d 714. They did not by striking in these circumstances cease to be employees. Their

discharge for engaging in the strike was accordingly a violation of § 8(a)(1) and (3) of the Act. N. L. R. B. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 347, 58 S.Ct. 904, 82 L.Ed. 1381, and cases last above cited. It has long been settled that in a situation like the present the employer is free to hire replacements for the strikers, N. L. R. B. v. Mackay, supra, but the authorities uniformly hold that the discharge of economic strikers prior, as here, to the time their places are filled constitutes an unfair labor practice. While the Mackay case, supra, foreshadowed this doctrine, the first clear enunciation of it appears to have been by the second circuit in N. L. R. B. v. Remington Rand, Inc., 130 F.2d 919. Among the numerous subsequent holdings to this effect see Carter Carburetor Corp. v. N. L. R. B., supra; N. L. R. B. v. Kalamazoo Stationery Co., 6 Cir., 160 F.2d 465; J. A. Bentley Lumber Co. v. N. L. R. B., 5 Cir., 180 F.2d 641; N. L. R. B. v. Kennametal, Inc., 3 Cir., 182 F.2d 817; Morand Bros. Beverage Co. v. N. L. R. B., 7 Cir., 190 F.2d 576, 582, 583; Cusano v. N. L. R. B., 3 Cir., 190 F.2d 898, 901, 902.

The evidence is undisputed that the 19 striking employees were discharged flatly and immediately. The violation thus was a fait accompli. It would seem immaterial what might have been the attitude of the employer had the strikers thereafter given up their demand regarding Jones' reinstatement and sought to get their jobs back.

2. Respondent argues that it was justified in discharging the strikers because the strike was illegal. For the most part the grounds on which illegality is predicated are unworthy of serious attention. We notice only the claim that the strike was called in violation of the Federal Communications Act, 47 U.S.C.A. § 201 et seq.

■ This Act imposes on carriers engaged in interstate or foreign communications by wire or radio the duty to serve all without discrimination upon reasonable request. 47 U.S.C.A. § 201. The carrier

2. The precise view of the examiner is not clear to us, but his thought seems to have been that notwithstanding the discharge the operators could have had their jobs back at any time before they were filled by new employees.

is prohibited from abandoning service without first obtaining permission from the FCC. 47 U.S.C.A. § 214. There is a provision making it unlawful for any person willfully and knowingly to cause or suffer to be done anything declared by the statute to be unlawful, or to cause or suffer to be omitted anything required by the statute. 47 U.S.C.A. § 501. It is argued that the employees committed a crime under that section by striking and thereby causing respondent to violate the first two provisions referred to above. Southern Steamship Co. v. N. L. R. B., 316 U.S. 31, 62 S.Ct. 886, 86 L.Ed. 1246, is cited as a controlling precedent. That case stands in a class by itself, involving as it did the impact of the Mutiny Act on the conduct of seamen who struck on board ship away from home port. A sufficient answer to the argument predicated on the Southern Steamship decision is that the Communications Act does not confer upon licensees thereunder the right to conscript labor, nor does it expressly or by reasonable implication undertake to restrict the right of employees to strike or quit their jobs, either singly or in concert. On the other side of the picture the right of employees to strike and to engage in concerted activities for their mutual aid and protection is expressly recognized in the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. International Union of United Automobile Workers v. O'Brien, 339 U.S. 454, 70 S.Ct. 781, 94 L.Ed. 978. It seems purely fanciful to assume, as does respondent, that the failure of a licensee to perform the obligations prescribed by the Communications Act would constitute a breach of such obligations on the licensee's part in instances where the failure is caused by an economic strike.

3. Another claim of respondent is that it was denied due process because not permitted by the examiner to have subpenas for the taking of depositions from all complaining witnesses prior to the hearing. There is no provision in the Act authorizing the use of the discovery procedure. This being true, so fundamental a complaint as the denial of due process can hardly be predicated on the examiner's ruling. Respondent was not denied a subpena where necessary to procure the presence at the hearing of any witness whom it desired to question.

4. The Board was of opinion that certain statements made by chief operator Bash were coercive, and so believing it found an additional violation of § 8(a)(1). In this respect it overruled the examiner who thought the remarks not violative of the Act, all circumstances considered. Bash's remarks were made in the course of conversations between himself and various of the employees. His expressions were apparently inspired by his conviction that the ACA was Communist dominated. The Board agreed that Bash was privileged under § 8(c)[3] to brand the ACA leaders and members as Communists, but his further statements were thought to have an unmistakably coercive tendency. Some of his declarations were to the effect that the ACA would never come back into the plant, and that it would be wise on the part of the employee addressed to get out of that organization "while the getting was good." Another, made to an employee named Conger, was that the ACA couldn't do her any good, and that she should "remember that it's pretty nice to keep eating, you know." There were a few other remarks of the same tenor. The Board thought such statements amounted to a warning to disavow the Union or "sink with it."

Bash was generally regarded as being of an excitable and undiplomatic temperament. It does not affirmatively appear that his utterances reflected the policy of the respondent; yet the employees may well have understood that he was speaking with authority. At least when

3. "(c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C.A. § 158(c).

considered in isolation, his expressions undeniably had a coercive tendency. We are not prepared to say that the Board's finding on this aspect is not substantially supported.

■ The charge filed with the Board alleged violations of § 8(a)(1) and (3) only by the making of the discharges. There was no averment of the independent coercive violations just now discussed, the latter being later incorporated in the Board's complaint. The respondent claims that a complaint issued under the Act as amended is limited in scope by the averments contained in the charge filed to initiate the proceeding. We see no basis for this view. The Board would not appear to be debarred by the amended Act from enlarging upon a charge unless the additional unfair labor practices alleged were committed more than six months prior to the enlargement. The inclusion here of the charge of coercion was made within six months of the allegedly coercive conduct.

■ 5. The Board ordered reinstatement with back pay, but found that to date there was no unconditional request for reinstatement indicative of an intention to abandon the strike. Accordingly it ordered back pay to be computed only from the date of the abandonment to the date Globe offered reinstatement. In this respect the order is a trifle obscure. We construe it to mean that the reinstatement or back pay obligation is not operative as to any complaining employee until such employee abandons the strike and evidences an unconditional willingness to return to work. As so construed it is a proper requirement.

■ 6. Because of the coercive practices discussed under heading 4 above the Board anticipated possible future misconduct on respondent's part, and accordingly ordered it to cease and desist from infringing in any manner any rights guaranteed. In view of the conclusion we have reached under heading 4, we are not able to say that the omnibus order is unwarranted.

A decree will be entered enforcing the order as prayed in the Board's petition.