### NATIONAL LABOR RELATIONS BOARD
v.
### COWLES PUB. CO.
No. 14139.

United States Court of Appeals
Ninth Circuit.
June 28, 1954.

Rehearing Denied Aug. 3, 1954.

Bone, Circuit Judge, dissented.

emption for "any employee employed in a bona fide * * * local retailing capacity * * *."

George J. Bott, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Asst. General Counsel, Frederick U. Reel, Dean E. Denlinger, Attys., N.L.R.B., Washington, D. C., Patrick Walker, Atty., N.L.R.B., Seattle, Wash., for petitioner.

Witherspoon, Witherspoon & Lelley, Spokane, Wash., William V. Kelley, Spokane, Wash., for respondent.

Before HEALY, BONE, and ORR, Circuit Judges.

HEALY, Circuit Judge.

In this case the primary finding of the trial examiner and of the National Labor Relations Board was that respondent violated § 8(a) (1) of the Labor Management Act, 29 U.S.C.A. § 158(a) (1), by discharging 16 of its employees for engaging in a concerted work-stoppage or strike. Respondent was ordered to reinstate the discharged employees with back pay from the date of their application for reinstatement, to post the customary notices, and to cease and desist from engaging in conduct violative of the Act.

Respondent publishes the Spokane Spokesman Review, a newspaper with a large Sunday edition. It employed part-time "inserters," as they are called, to assemble the different sections of the Sunday paper. The inserters were not organized or members of any union. Most of them were local college students who worked an irregular number of hours which they were permitted to schedule largely at their own convenience. On each Saturday evening, however, they were required to work from six o'clock until all the Sunday papers were assembled, a task usually taking nine or ten hours. They were paid on the basis of a piece rate varying in proportion to the weight of the sections assembled. The precise rate for a given section was often unknown until after that particular section had been inserted.

It appears that this uncertainty of pay and a feeling that the total pay was inadequate, coupled with dissatisfaction over a shortage of locker room facilities, had been for some time a source of discontent on the part of the inserters. There is undisputed evidence that complaints as regards both the locker rooms and the smallness of the pay were several times brought to the attention of a Mr. Crooks, a day foreman for respondent. It appears, however, that the grievances had not been communicated to higher authorities. During 1952 the dissatisfaction was heightened when the organized mailers, who worked in the same room with the inserters, received a pay in-

crease, whereas the unorganized inserters received none.

At an informal meeting of the inserters held on August 17 of that year a resolution specifying the grievances was drawn up by one of their number, Howard, demanding a pay increase of 20%, individual lockers, and the posting of respondent's standard for computing the piece rate. The resolution threatened economic pressure if the demands were not met. By the following Saturday, August 23, all the regular inserters had signed the resolution. At six o'clock that evening they decided to submit the resolution as soon as they began work at 6:15 and to strike at seven o'clock if their demands were not met. Pursuant to this decision Howard in company with another inserter handed the resolution to Munkers, acting foreman of the mailing room, and told him that a strike was planned for seven o'clock unless the demands stated in it were met. Munkers at once notified the assistant production manager, and the latter in turn telephoned Edmonds, the production manager for respondent, who ordinarily handled collective bargaining matters. Edmonds was at his home at the time. He and two other supervisory employees proceeded to the plant, arriving a little after seven o'clock. Meanwhile the inserters had stopped work at seven and had gathered in the locker room. They were asked by Munkers to stand by, as Edmonds would shortly be ready to see them. A few minutes later Munkers told them that if any of them wanted their jobs back they should go upstairs one at a time and talk to Edmonds. However, the inserters presented themselves to Edmonds in a body.

The meeting apparently lasted but a few minutes, and Edmonds did the talking. He termed the inserters' action unprecedented, commented on the shortness of the notice and the consequent lack of time on the part of respondent to consider the demands, and suggested that an immediate decision thereon was not possible. He concluded by saying that respondent "could not do business that way," that there was but one alternative, and that "you gentlemen are all through." Edmonds had been seated during his remarks, but at this juncture he stood up and all present departed. The witnesses describing this occurrence did so in varying terms, but there was no important variation in the substance of their accounts of it. Nor is there any substantial dispute on respondent's part as to what Edmonds said.

Respondent was able to get its paper out that night only by calling upon former inserters, others of its employees, and employees of another plant. During the ensuing week it began hiring replacements for the striking inserters, completing this task sometime prior to Friday, August 29. On that day Howard, speaking for all the strikers, asked Edmonds to reinstate them. The request was denied on the ground that all had been replaced.

Respondent's contentions are (1) a half-hearted claim that the inserters were not in fact discharged, and (2) that, if discharged, their work-stoppage was an unprotected activity inasmuch as their plans had not been disclosed a sufficient time beforehand, and because they chose to strike under circumstances which would put respondent under the maximum of pressure.

■ The record abundantly supports the finding that the inserters were discharged, and that that action was taken because they had gone on strike. Moreover it is plain that the discharges occurred approximately an hour after the strike began and some days prior to the inserters' being permanently replaced. Further, there is no dispute that the strike was in support of specified demands for a raise in pay and for improved working conditions, submitted to the employer prior to striking.

■ It is settled law in this circuit that an employer is at liberty to replace employees who engage in a concerted work stoppage for economic objectives. But it is equally settled that he may not, prior to replacing the employee, *dis-*

*charge* him for engaging in such activity. N.L.R.B. v. Globe Wireless, 9 Cir., 193 F.2d 748, and authorities cited; N.L.R.B. v. Buzza-Cardozo, 9 Cir., 205 F.2d 889, certiorari denied 346 U.S. 923, 74 S.Ct. 310. Accordingly unless for the reasons advanced by respondent the strike here falls outside the area of concerted activity for mutual aid and protection, the finding of the Board that respondent violated § 8(a) (1) of the Act was appropriate.

[3] We see no ground for believing that the shortness of the notice given by the inserters and the precipitate action thereafter taken by them renders their strike unprotected. In Globe Wireless, supra, the employees involved were held protected from discharge even though, as was true in that instance, they had stopped work before their grievances were presented. The case before us is not one where a strike was had in repudiation of a contract not to strike, nor was it a wildcat strike, or an attempt by the employees unilaterally to prescribe their own working conditions, as was the situation in the cases relied on by respondent.

We may add that had Edmonds, instead of summarily discharging these men, merely warned them that respondent would permanently fill their places in event they continued the strike, he would have been on safe ground.

Respondent objects to the breadth of paragraph 1(b) of the Cease and Desist Order, which reads:

"1. Cease and desist from:

\* \* \* \* \* \*

"(b) In any other manner interfering with, restraining, or coercing its employees in the exercise of the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, or to refrain from any or all of such activities, except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment, as authorized in Section 8(3) of the Act."

We agree that in the circumstances of this case the paragraph is unjustifiably broad, and to that extent the Board's order is modified. Cf. National Labor Relations Board v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930. Paragraph (a) would seem to sufficiently cover the matter.

Decree will be entered enforcing the order as modified.

BONE, Circuit Judge (dissenting).

I would deny enforcement of the Board's order as it was modified by the majority.

The unusual facts shown by the record in this case clearly indicate that an abrupt demand for a wage increase was first made by the inserters on certain minor employees of respondent then engaged in and about respondent's plant. The demand was carefully timed to come at an hour on late Saturday evening when these minor employees faced the necessity of then getting out the Sunday edition of the paper to meet certain time schedules. The demand was in the form of an ultimatum—"grant us the demanded raise at once or get the papers out anyway you can."

As the prevailing opinion points out, an employee (Edmonds) who ordinarily handled collective bargaining matters was then called from his home, arriving after the inserters had stopped work at 7:00 p. m. Some colloquy then ensued, but nothing in the record suggests that Edmonds possessed authority to summarily grant the demanded raise without any consultation with the owners of the newspaper. The fact that even the opportunity for such a consultation was completely foreclosed by the terms of the wage demand, is a circumstance which

seems to have absolutely no significance in the eyes of the Board officials.

Much in the way of fulsome praise of the "collective bargaining" procedure has appeared in court comments and in articles by those friendly to organized labor. But the circumstances here presented clearly indicate that the time element made "bargaining" of any sort an utter impossibility. The inserters made abundantly plain that they wanted no palaver over the matter of compensation; that so far as they were concerned, the Sunday issue of the paper could remain in the plant. The action of the Board officials indicates that they thought this course was eminently proper. If the theory is sound, every railroad union in America could meet, formulate a general demand for higher compensation throughout the nation, and give the railroads five minutes notice to meet the demand or all trains would cease to move. Responsible labor groups do not "bargain" in that fashion.

It is not amiss to point out that a week (or even less) of "negotiations" through official channels might have been quite sufficient to bring about an amicable adjustment of the instant wage demand, and it cannot be doubted that any raise of pay which resulted could have been made retroactive to cover the Saturday work and future work. The action of the inserters, along with that of the Board, made impossible such a reasonable solution. The least that can be said about this suggestion is that it would have ended this tempest in a teapot.

The incontinent haste which characterizes every aspect of this very unusual proceeding is not calculated to add dignity to Board proceedings or encourage collective bargaining. It justifies application of the pointed and pertinent remarks of the Fifth Circuit appearing in the first two paragraphs of the opinion in N.L.R.B. v. Roscoe Skipper, Inc., 213 F. 2d 793.