**SUMMIT MINING CORPORATION,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent.

No. 12573.

United States Court of Appeals
Third Circuit.

Argued Sept. 16, 1958.

Decided Oct. 28, 1958.

Horace E. Smith, York, Pa. (Thomas H. Reed, York, Pa., Charles W. Wolf, Gettysburg, Pa., on the brief), for petitioner.

Thomas Ryan, Washington, D. C., and Falls Church, Va. (Jerome D. Fenton, General Counsel, Thomas J. McDermott, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Frederick U. Reel, Attorney, National Labor Relations Board, Washington, D. C., on the brief), for respondent.

Before GOODRICH, STALEY and HASTIE, Circuit Judges.

STALEY, Circuit Judge.

This is a petition to review and set aside an order of the National Labor Relations Board [1] requiring the Summit Mining Corporation to cease and desist from refusing to bargain collectively with the United Cement, Lime and Gypsum Workers' International Union, AFL–CIO and to take other affirmative action. The Board in its answer asks enforcement of the order.

■ The case originated on October 2, 1956, on a charge filed with the Board by the union alleging unfair labor practices within the meaning of Section 8(a), subsections (1), (3) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1), (3) and (5).[2] Specifically,

---

[1]. The Board's decision and order are reported at 119 N.L.R.B. —— (No. 208) (1958).

[2]. "§ 8(a) It shall be an unfair labor practice for an employer—
  "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 of this title;

  *    *    *    *    *

  "(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *

the charge alleged discriminatory discharges resulting from interest, activity, or membership in the union, refusal to bargain collectively with the union, and coercive action by the petitioner which restrained its employees' rights guaranteed by Section 7 of the Act.[3] The Board adopted the findings, conclusions, and recommendations of the trial examiner which were to the effect that petitioner had violated Sections 8(a) (1) and (3) of the Act by discharging six employees because they went on strike to protest the lawful discharges of a foreman and a rank-and-file employee. It was further found that petitioner violated Section 8 (a) (5) of the Act by refusing to bargain collectively with the union as the exclusive representative of its employees in an appropriate unit.

On August 23, 1956, all ten of petitioner's production and maintenance crew, as well as three foremen, signed applications for membership in the union. The following day Speciale, a union representative, addressed a letter to petitioner, advising petitioner that the union represented a majority of its employees and requesting a conference. Petitioner replied by letter dated August 30, 1956, and a conference was held on September 7. Speciale again advised petitioner that virtually all its employees had designated the union as their representative. When petitioner's attorney asked how the problem might be resolved (i. e., the request for recognition), Speciale stated, "There are two ways to resolve our problem; one would be for the company to recognize the union on a card check; or we could go to an NLRB election." Petitioner chose the latter method and the union that same day filed a representation petition with the Board. A hearing on the petition was duly set for September 21.

* * * *

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a) of this title." 49 Stat. 452 (1935), as amended, 61 Stat. 140 (1947), 65 Stat. 601 (1951), 29 U.S.C.A. § 158.

Two days prior to the scheduled hearing petitioner, acting upon the recommendation of Foreman John Baltzley, discharged employee Merl Phillips for what have been admitted were lawful reasons. The next day Baltzley was also discharged upon his refusal to sign a statement concerning Phillips' discharge. That evening a majority of the employees met with Roth, another union representative, and discussed among other matters the discharges of Baltzley and Phillips, both of whom had previously signed applications for union membership. The employees asked Roth to seek reinstatement of the two discharged employees, indicating that they were prepared to strike in support of this demand.

At the representation hearing on September 21, Roth's request for reinstatement was refused by petitioner, whereupon Roth stated that reinstating the two would "avoid trouble." After the hearing Roth informed Baltzley and Phillips that his efforts in behalf of reinstatement had been unsuccessful, and at their request he furnished them several picket signs bearing the name of the union. Later the same day two employees approached petitioner's production manager, Beard, and stated that the union would not be responsible for what happened unless the plant was closed within thirty minutes. One of the employees indicated that a strike would be called unless the two discharged employees were reinstated. Beard refused to reinstate Baltzley and Phillips and ordered the plant closed. Whereupon, six of the nine employees then in the bargaining unit (the others then being on another shift) left the plant and formed a picket line. Still later the same day, petitioner decided to discharge the strikers and accordingly mailed them their final paychecks the following day, September 22.

3. An amended charge, filed December 10, 1956, merely elaborated upon the allegation concerning discriminatory discharges.

The picketing which began on September 21 continued until November 12, 1956. Meanwhile, on October 1, the union withdrew its representation petition and subsequently filed unfair labor practice charges with the Board. Three of the six strikers applied for reinstatement on November 12 and were subsequently reinstated.[4]

Petitioner contends that the Board's findings are erroneous as to all three of the charges of unfair labor practices. For the reasons set forth herein, we feel the Board's determinations correct insofar as they relate to violations of Sections 8(a) (1) and (3). However, we are constrained to agree with petitioner's contention that there has been no refusal to bargain, § 8(a) (5).

Specifically, as to the unfair labor practice charge predicated upon Section 8(a) (1) of the Act, petitioner contends that the six discharged employees, who struck in support of a request for reinstatement of Baltzley and Phillips, were not engaged in a concerted activity such as is protected by the Act since it was not for the purpose of advancing their own cause or for their mutual aid or protection. A number of courts have considered this problem. Perhaps the clearest and most concise treatment of the subject is to be found in National Labor Relations Board v. Peter Cailler Kohler Swiss Chocolates Co., 2 Cir., 1942, 130 F.2d 503, 505–506, wherein Judge Learned Hand said:

"When all the other workmen in a shop make common cause with a fellow workman over his separate grievance, and go out on strike in his support, they engage in a 'concerted activity' for 'mutual aid or protection,' although the aggrieved workman is the only one of them who has any immediate stake in the outcome. The rest know that by their action each one of them assures himself, in case his turn ever comes, of the support of the one whom they are all then helping; and the solidarity so established is 'mutual aid' in the most literal sense, as nobody doubts."

The fact that the discharges being protested were lawful (i. e., not unfair labor practices in and of themselves) does not preclude a strike in protest thereof being protected. On the contrary, Cusano v. National Labor Relations Board, 3 Cir., 1951, 190 F.2d 898; National Labor Relations Board v. McCatron, 9 Cir., 1954, 216 F.2d 212, certiorari denied 1955, 348 U.S. 943, 75 S.Ct. 365, 99 L.Ed. 738, and National Labor Relations Board v. Globe Wireless, 9 Cir., 1951, 193 F.2d 748, all stand for the proposition that as long as the strikers in good faith thought that the discharges had been effected because of union activities or for some other reason proscribed by the Act their concerted activity was within the protection of Section 7 of the Act.

Principal reliance has been placed by the petitioner upon three cases, only one of which—Joanna Cotton Mills Co. v. National Labor Relations Board, 4 Cir., 1949, 176 F.2d 749—appears to warrant extended discussion.[5] In that case an employee was reprimanded by a supervisor for loitering and operating a lottery device. He became angry and abusive and began to circulate a petition demanding the supervisor's discharge. For such activity he was discharged. The

4. The remaining three strikers did not request or receive reinstatement. As stipulated, because of "certain conduct" in which they engaged during the course of the strike, their reinstatement is not at issue.

5. The other two cases are N. L. R. B. v. Reynolds International Pen Co., 7 Cir., 1947, 162 F.2d 680 (strike in protest over demotion of a foreman held not to be a concerted activity within the Act's protection), and N. L. R. B. v. Bretz Fuel Co., 4 Cir., 1954, 210 F.2d 392 (strike in protest over the barring of an· employee of the union, a checkweighman, from employer's premises held not to be a concerted activity protected by the Act). Inasmuch as the instant strike was in protest over the discharge of a rank-and-file employee as well as a foreman these cases do not appear relevant.

Court of Appeals found that the petition was merely a continuation and aggravation of the original defiant conduct of the employee and was in no sense the engaging in "concerted activity" for mutual aid or protection contemplated by the Act. In reaching that conclusion the court recognized that "The petition cannot be viewed apart from the circumstances which give rise to it * * *." 176 F.2d at page 753. The circumstances of the instant case, as found by the trial examiner, can be summarized as follows: the strike was in protest of the discharge of a *rank-and-file employee* as well as a foreman; both discharged employees were applicants for membership in the union; the movement for reinstatement was approved at a meeting of employees who had applied for membership in the union; a union representative presented the demand for reinstatement to the petitioner; fellow applicants for union membership instituted the strike to enforce their demands for reinstatement; and the union's approval was indicated by the picket signs furnished the strikers. Thus, the case before us is factually dissimilar from the Joanna Cotton Mills case.

Petitioner further contends that the trial examiner, and later the Board, erred in finding an unfair labor practice under Section 8(a) (3) inasmuch as the record fails to establish that petitioner intended to discourage union membership by the discharge of the strikers.

In essence, petitioner asserts that a subjective test should be applied in analyzing its action. Two of the cases principally relied upon by petitioner fail to support this contention and in reality support the opposite conclusion; namely, that an objective test should be utilized. National Labor Relations Board v. Whitin Machine Works, 1 Cir., 1953, 204 F.2d 883; National Labor Relations Board v. J. I. Case Co., 8 Cir., 1952, 198 F.2d 919. If the discharges had the proximate and predictable effect of encouraging or discouraging membership in a labor organization and were in fact discriminatory, they constitute unfair labor practices pursuant to Section 8(a) (3) of the Act. In any event petitioner's contention has been foreclosed by the decision of the Supreme Court in Radio Officers' Union of Commercial Telegraphers Union, A. F. L. v. National Labor Relations Board, 1953, 347 U.S. 17, 44–45, 74 S.Ct. 323, 98 L.Ed. 455.

A study of the record in the instant case leads to the conclusion that there is substantial evidence to support the Board's findings of unfair labor practices pursuant to Sections 8(a) (1) and (3) of the Act.

■ However, viewing the record as a whole fully and fairly in its entirety, we find no substantial basis in the evidence to support the specific finding of the Board that petitioner unlawfully refused to bargain with the union on and after September 21, 1956, in alleged violation of Section 8(a) (5) of the Act. The employer's duty to bargain with his employees is too clear to be questioned. However, the Supreme Court in National Labor Relations Board v. Columbian Enameling & Stamping Co., 1939, 306 U.S. 292, 297, 59 S.Ct. 501, 504, 83 L.Ed. 660, has stated:

"While the Act thus makes it the employer's duty to bargain with his employees, and failure to perform that duty entails serious consequences to him, it imposes no like duty on his employees. Since there must be at least two parties to a bargain and to any negotiations for a bargain, it follows that there can be no breach of the statutory duty by the employer—when he has not refused to receive communications from his employees—without some indication given to him by them or their representatives of their desire or willingness to bargain. In the normal course of transactions between them, willingness of the employees is evidenced by their request, invitation, or expressed desire to bargain, communicated to their employer."

The letter of August 24, 1956,[6] directed by Speciale to the petitioner stated that the union had a majority of petitioner's employees and requested a meeting in which this assertion could be proven. Petitioner's reply [7] indicated a willingness "to confer * * * in the near future to discuss this problem [union recognition]." Speciale testified that the meeting which was held shortly thereafter was on the most friendly terms. Speciale further testified in relating what transpired at the meeting that he was asked by the spokesman for the petitioner:

"how we were going to resolve this problem. It was the problem of my requesting recognition of the Summit Mining Company. I said to Mr. Smith: There are two ways to resolve our problem; one would be for the company to recognize the union on a card check; or, we could go to an NLRB election.

\* \* \* \* \* \*

6. "Mr. Edward Beard,
    Plant Superintendent
    Summit Mining Corp.
    Aspers, Pa.
"Dear Sir:
    "This is to advise you that the majority of employees eligible for membership in the union (Aspers, Pa. plant) have become members of the United Cement, Lime and Gypsum Workers International Union, affiliated with the A.F.L.–C.I.O. and thereby have designated our International Union to bargain and consummate their agreement of wages, hours and working conditions with there [sic] employer, the Summit Mining Corp.
    "Therefore, I desire to inform you that we do represent the majority of employees of the above Summit Mining Corp. and would appreciate your setting of a date to confer with you in the near future and thereby determine and show proof of the above statement.
    "If no reply is received, I will assume that it will be necessary for the National Labor Relations Board to intervene in this matter.
    "You may reach me at our district office, 135 South 3rd Street, Easton, Pennsylvania, Easton 3–2793.

"With Mr. Smith's answer that they would prefer to go to an NLRB election, of course that was the end of the discussion as far as recognition. We sat around the office for approximately three-quarters of an hour discussing various companies that the company sold their product to that we had contractual relations with within our own International Union."

Upon cross-examination Speciale was asked, "Immediately upon you giving Mr. Smith the two choices, he said: We will go to the recognition hearing; is that correct?" Speciale answered, "We will go to the NLRB." On redirect examination government counsel pointedly asked, "Mr. Speciale, did you give Mr. Smith two choices?" and he answered, "Yes, I did."

Thus, it is clear that the union offered the petitioner alternate methods of resolving the recognition issue and petitioner adopted one of them; negotia-

"Anticipating an early reply, I remain
    "Very truly yours,
            (s)  VINCENT SPECIALE
                Vincent Speciale,
                General Representative."
                    "August 30, 1956

7. "Vincent Speciale
    General Representative
    United Cement, Lime Gypsum
    Workers International Union
    135 South Third Street
    Easton, Pennsylvania
        "Re: Summit Mining Corporation
            —United Cement, Lime and
            Gypsum Workers International Union
    "Dear Mr. Speciale:
    "Your letter of August 24, 1956, addressed to Mr. Edward Beard, Plant Superintendent of Summit Mining Corporation, has been referred to me as President of this Corporation for reply.
    "We will be willing to confer with you in the near future to discuss this problem. If you will contact me directly by telephone, perhaps we can fix a definite time for this conference.
        "Very truly yours,
                Summit Mining Corporation
        By (s) GEORGE W. AHL, Jr.
                George W. Ahl, Jr.
                    President"

tions were conducted in a cordial atmosphere; the meeting was held without delay; and the only issue raised by the union in either its letter or at the meeting was disposed of in accordance with a suggestion proffered by the union. Accordingly, the cases concerning employers who demanded a Board election and thereafter through coercive and intimidatory acts dissipated the union's majority prior to the election are inapposite. The petitioner herein merely chose one of the two alternatives proposed by the union and thus clearly does not fall into the same category as those employers whose demand for an NLRB election was a mere pretext or sham, not based on a good-faith doubt as to the union's majority. It is not necessary here to consider the question of petitioner's good faith for it was given a choice and merely chose one of the methods suggested by and acceptable to the union. The acts committed subsequently are not relevant for they are merely persuasive evidence of the actual intent of an employer who *demands* a Board election.

■ However, the Board, adopting the findings of its trial examiner, has found that the union represented a majority of petitioner's employees and, pursuant to Section 9(a) of the Act, was the exclusive representative of all the employees in the appropriate unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, and other conditions of employment. Inasmuch as the finding is supported by substantial evidence, if proper request be made upon petitioner by representatives of the union it would manifestly be the duty of petitioner to recognize the union as its employees' bargaining agent. National Labor Relations Board v. Caldarera, 8 Cir., 1954, 209 F.2d 265; D. H. Holmes Co. v. National Labor Relations Board, 5 Cir., 1950, 179 F.2d 876; Texarkana Bus Co. v. National Labor Relations Board, 8 Cir., 1941, 119 F.2d 480. This provision of the order does not depend upon a previous demand by the union or a refusal by petitioner. It looks to the future and

only in the event such request shall be made will petitioner be required to bargain collectively with the union.

The order of the Board as modified herein will be enforced. A proposed decree may be submitted.