284 F.2d 573
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
J. MITCHKO, INC., Respondent.
 No. 13235.
 United States Court of Appeals Third Circuit.
 Argued October 4, 1960.
 Decided December 8, 1960.
 
 Rosanna A. Blake, Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Robert Sewell, Atty., N. L. R. B., Washington, D. C., on the brief), for petitioner.
 Samuel Weitzman, Newark, N. J. (Parsonnet, Weitzman & Oransky, Newark, N. J., on the brief), for respondent.
 Before BIGGS, Chief Judge, and HASTIE and FORMAN, Circuit Judges.
 HASTIE, Circuit Judge.
 
 
 1
 The National Labor Relations Board has decided that J. Mitchko, Inc., a trucking corporation, violated Section 8(a) (3) and (1) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 158(a) (1, 3), by the discriminatory discharge of Owen Edgerly, Joe Ford and George Champignon, three of its truck drivers. The Board found that these drivers were discharged for membership in or activity with a Teamsters' local union. Pursuant to that finding the Board ordered reinstatement of the discharged employees. Opposing the Board's petition for enforcement of this order, the employer has argued to us that, under the test of substantial evidence on the entire record, it cannot reasonably be concluded that union membership or activity was a cause of the dismissals. We, therefore, must analyze the evidence.
 
 
 2
 First, there is only a minimal showing through tenuous inference that any responsible Mitchko official even knew of union activity among its employees before the discharge in question. Edgerly, Ford and Champignon were discharged November 15th. The record is clear that, although there had been serious trouble between management and the drivers in October, the first discussion of unionization occurred during an informal discussion among the truck drivers on November 6th. The next day the drivers met with a representative of Teamsters' Local 770 and signed union cards. However, during the days which followed, Mitchko received no communication from the union or from the newly organized drivers advising it of this unionization. The Board's conclusion that the employer had learned of union activity among its employees is an inference drawn from certain conversations of a foreman, Albert Arnott, with various truck drivers on November 13th and 14th. Arnott asked Edgerly, "what's this about the union?" Edgerly replied, "I don't know anything about it, Al." Apparently similar inquiries were addressed to other employees but no disclosures resulted. There is also evidence that Arnott said: "They will never get a goddam union in here." On the other hand, there is uncontradicted testimony that Arnott was not instructed by management to make these inquiries and made no report of the conversations. At most then we have evidence that on November 13th and November 14th Arnott suspected union activity among the drivers and an inference from Arnott's supervisory status that this suspicion was shared by or communicated to more responsible representatives of management. From this inference the Board has drawn the further inference that management's awareness of union activity motivated the discharge of the three truck drivers on November 15th.
 
 
 3
 If this were the entire record, the Board's case, though weak, might arguably suffice to make judicial interference with its factual conclusions improper. But there is much more evidence on this issue.
 
 
 4
 Mitchko, a small trucking business, employed no more than six drivers at the times now in question. Among these, Melvin Leek played the leading role in unionization. It was he who urged his fellow drivers to organize. He brought a union representative to meet with them. At the November 7th organization meeting he was chosen shop steward. Moreover, when Arnott questioned the drivers concerning suspected union activity, all denied knowledge of it except Leek, who replied that it was none of Arnott's business. Yet, no move was made to discharge or in any way discipline Leek when Edgerly, Ford and Champignon were dismissed. It is not credible that the employer, having learned through Arnott of union activity and bent on reprisal, would discharge half of its small force yet retain the principal union agitator who had openly assumed a defiant attitude when questioned about the union.
 
 
 5
 In addition, there was a persuasive showing of other reasons for the dismissals. The record shows and all concerned agree that Mitchko's trucks were in very bad mechanical condition. During the approaching winter season the hazard of driving trucks in poor repair would increase. At the same time a seasonal decline in business was anticipated. Furthermore, Edgerly, Ford and Champignon had been the employees principally involved in certain earlier acrimonious disputes with management which are not the subject of or included in the present complaint. Indeed, as a result of a work stoppage in connection with this earlier dispute, these three men had been placed at the bottom of the employer's seniority list. Undoubtedly, they were in disfavor. In these circumstances, during the last week in October and the first week in November, before unionization had even been suggested, the employer began negotiations with three independent owners of trucks with a view to temporarily replacing some Mitchko trucks with owner-operated trucks during the months ahead. The testimony is that this was contemplated as a temporary expedient during the slack season to permit the withdrawal of Mitchko's own trucks from service for repair. This was substantiated by unchallenged testimony that on November 11th the president of Mitchko had arranged for three owner-operators to report to Mitchko on November 16th. The record shows and the parties agree that these owner-operators did report on November 16th and thereafter worked every day from November 18th to December 11th. Subsequently, they worked occasionally in January and February. In brief, it is clear on the record that Mitchko began negotiating with owner-operators before there was any union activity among its drivers, and that actual requests for such drivers to report on a day certain were made before the time when Mitchko is said to have become aware of union activity. This chronology makes it difficult to escape the conclusion that equipment problems, a seasonal decline of business, and earlier difficulties with Edgerly, Ford and Champignon all combined to cause the employer to discharge these men on November 15th. On the one hand, the record leaves it very doubtful whether union activity could have been the reason for the dismissals, while on the other hand, there is very substantial evidence of different motivation.
 
 
 6
 We have considered the Board's additional point that management showed bad faith in that, before discharging Edgerly, Ford and Champignon, it offered to let them become owner-operators if they would buy its old trucks at exorbitant prices. For present purposes we will assume that the employer did make this proposal anticipating or even desiring its rejection. This may well indicate a disposition to get rid of these three men in view of past disputes with them. But it has no tendency to show that the employer knew of or was motivated by the drivers' union activity.
 
 
 7
 Our analysis of the entire record leads us to conclude that the Board's finding of a causal relationship between union activity and the discharge of Edgerly, Ford and Champignon is not supported by substantial evidence and, therefore, cannot stand.
 
 
 8
 The Board also ordered the reinstatement of Melvin Leek. He had gone on strike in protest over the discharge of Edgerly, Ford and Champignon. The Board found and the record shows that an unqualified demand was made by the union for the reinstatement of Leek less than two weeks after the strike began and that the employer ignored this demand. Concluding that Leek was engaged in an unfair labor practice strike, the Board ruled that the refusal to reinstate him was in itself an unfair labor practice.
 
 
 9
 But we now have concluded that the strike was not caused by an unfair labor practice of the employer. Nevertheless, this strike was concerted action taken in protest against the discharge of fellow employees. As such, it was a proper activity and to punish the strikers for it by discharging them or denying them reinstatement would be an unfair labor practice. Summit Mining Corp. v. N. L. R. B., 3 Cir., 1958, 260 F. 2d 894, 897; Cusano v. N. L. R. B., 3 Cir., 1951, 190 F.2d 898, 902. This principle is qualified by permitting the employer to make a bona fide replacement of such strikers, so that thereafter the employer need not rehire them unless suitable vacancies shall exist. N. L. R. B. v. Mackay Radio & Telegraph Co., 1938, 304 U.S. 333, 345-346, 58 S.Ct. 904, 82 L. Ed. 1381; N. L. R. B. v. Globe Wireless, Ltd., 9 Cir., 1951, 193 F.2d 748, 750.
 
 
 10
 In this case three truck drivers struck. One returned to work almost immediately. Some ten days later proper demand was made for reinstatement of the other two strikers. In the meantime Mitchko had employed one new driver. When the strikers demanded reinstatement the employer did not offer the new hiring as an excuse for not reinstating these strikers, or either of them. Certainly, it gave no indication of willingness to place either of them in the position which had not been filled. It merely ignored their demand. Moreover, this action of Mitchko is to be considered in the light of statements by its president during the strike indicating his unwillingness to employ these strikers any longer. In these circumstances, we think the employer may not now for the first time offer the hiring of one new driver as justification for rejecting the demand for reinstatement.
 
 
 11
 One other matter is urged as an excuse for not reinstating Leek. It is said that during the strike he was guilty of gross and disqualifying misconduct. However, the Board concluded that Leek's behavior had not been such as to destroy his normal right to reinstatement.
 
 
 12
 The record makes it clear that on several occasions during the strike Leek participated in interference with loaded Mitchko trucks while they were moving on the public highways. He and other union adherents repeatedly drove their own cars along the highways, closely attending the Mitchko trucks. At times they would drive in front of a truck and reduce their own speed so as to cause the truck to slow down. The normal hazards of driving on the narrow and winding roads of northwestern New Jersey where this motorized picketing occurred may well have been increased by the conduct of Leek and his associates, though this is not elaborated in the record. Fortunately, no accident occurred. The Board and the trial examiner seem to have reasoned that the picketing cars did not cut over so sharply or decelerate so rapidly as to cause serious danger of harm.
 
 
 13
 In the Board's position we might have been more censorious of the strikers' conduct. Cf. N. L. R. B. v. Morris Fishman & Sons, Inc., 3 Cir., 1960, 278 F.2d 792 (interference with truck loading). Yet on the present record we cannot say that the misconduct was clearly so grave that the Board's refusal on that account to disqualify Leek from reinstatement constituted an abuse of discretion. Cf. N. L. R. B. v. Crowley's Milk Co., 3 Cir., 1953, 208 F.2d 444; N. L. R. B. v Stackpole Carbon Co., 3 Cir., 1939, 105 F.2d 167, certiorari denied 308 U.S. 605, 60 S.Ct. 142, 84 L.Ed. 506.
 
 
 14
 The Board's order will be modified so that only the refusal to reinstate Leek will be adjudged an unfair labor practice subject to redress by reinstatement with back pay. The order as thus modified will be enforced.