**LTV ELECTROSYSTEMS, INC.,**
**Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 12101.**

United States Court of Appeals
Fourth Circuit.

Argued Oct. 28, 1968.

Decided March 28, 1969.

Winter, Circuit Judge, dissented in part.

---

9. See note 3, *supra*.

Homer L. Deakins, Jr., Greenville, S. C. (Thompson, Ogletree & Haynsworth, Greenville, S. C., on brief), for petitioner.

Thomas E. Silfen, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Lawrence M. Joseph, Atty., N. L. R. B., on brief), for respondent.

Before BRYAN, WINTER and CRAVEN, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge:

Upon the finding of the National Labor Relations Board that LTV Electrosystems, Inc. was in violation of the Act, 29 U.S.C. § 151 et seq., on the several occasions to be enumerated, LTV petitioned this court to review and set aside, and the Board cross-petitioned to enforce, the Board's compliance order 169 NLRB No. 64 (January 31, 1968).

We shall review each instance separately to determine "whether on the record as a whole there is substantial evidence to support" the Board's findings. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Except as may be noted, the Board agreed with the decisions of the trial examiner, and his findings and conclusions will be treated as those of the Board.

■ The factual background is of concern. Beginning in June 1965, the charging party, the United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO, began an organizing campaign in LTV's Greenville, S. C. plant. Throughout the period of the unfair labor practices found by the Board—July 1965 through August 1966—pro- and anti-union sentiments were abroad in the plant. To avoid repetition, it is now recognized that the employees whose discharges or disciplining are at issue in this case were known to be alert unionists, either organizers, committeemen or otherwise fosterers of the union. It is also recognized that union membership does not confer immunity upon employees for failure or wilful omission to meet their obligations to their employer. To be remembered, too, many of the company's supervisors and leadmen previously had been members of the UAW.

■ 1. Upon a representation petition, an election was held in December 1965, but the ballots were promptly impounded pending settlement of the status of "leadmen". On April 15, 1966, the Board decided that leadmen were not supervisors. This meant that they were within the collective bargaining unit eligible to vote in the election, and protected in the exercise of organizational activities by Section 7 of the Act, 29 U.S.C. § 157. The leadmen issue was not laid to rest until on appeal the Board was upheld here on January 18, 1968. LTV Electrosystems, Inc. v. NLRB, 4 Cir., 388 F.2d 683. This resolution, we think, requires sustainment of the Board's ruling, instantly, that without new evidence—and there was none—the company was not to relitigate the leadman question.

2. Leadman Wendell R. Chavis was discharged on September 15, 1965, for violation of the rule forbidding employees to leave their assigned work place without permission. Chavis earlier had been reminded of it, on August 20, 1965, following a trip to the first aid station in his building, solely to tout the union to the nurse. Chavis denied knowledge of the rule, and was assured by the general

foreman that as he had not seen the rule, he would not be penalized for its violation. Before August 20, the trial examiner found, the restriction was generally regarded, both in common understanding and enforcement policy, to refer only to inter-building trips.

On August 25, an unprovoked and abusive appellation applied by Chavis to Foreman Martin drew from him, in angry response, the prediction that Chavis' continual union efforts would soon result in his discharge. When it did come later, September 15, 1965, Chavis was informed by Superintendent Hogan that it was due to his violations of the rule after prior warnings. Chavis contends that Hogan refused his request to name the times. Before the examiner, Hogan and General Foreman Ashley testified that on several occasions in September, Chavis had been observed in buildings other than his, and in areas of his building where entry without permit was verboten. These witnesses both stated that in the termination interview, Chavis was told of his infractions of the straying rule.

The examiner found that there was no company rule in effect on August 20 to bar Chavis from going to the first aid station without a pass. He concluded that the caution following this visit was uncalled for. He added that the warning was prompted by the nurse's disclosure to the company of Chavis' union purpose rather than by his trip. Anti-union animus on the part of LTV was also evinced, the examiner inferred, in Foreman Martin's prophecy of Chavis' discharge. Furthermore, the examiner inferred discrimination against Chavis from the absence of other enforcement incidents of the travel ban. The examiner thereupon declared that the real motivation for Chavis' discharge was the employer's hostile union feelings, the allegations of infractions of the rule but pretexts. Chavis' release was held to be a violation of Section 8(a) (3) and (1) of the Act, 29 U.S.C. 158(a) (3) and (1). Additionally the forecast expressed by Foreman Martin was found violative of 8(a) (1).

 The examiner reasoned that the evidence of anti-union actuation established discrimination at least prima facie. The case thus made, he held, was not rebutted by the company. A majority of the court is unwilling to say that the Board could not draw these deductions from the evidence. The author of this opinion cannot concur in this view, but the Board's order will, of course, be upheld.

3. Leadman Metcalf, and Employees Cooper and Turner, were discharged for harassing Keenan, the leadman of an engine crew rivalling Metcalf's. Described as high strung, and as an overzealous worker, Keenan was the unwilling victim of considerable badgering by fellow workers. Although the Board termed the derision and threats of bodily harm to Keenan as "horseplay", the examiner found they had significant detrimental effect upon Keenan as well as upon the shop's atmosphere in general. The tyrannizing was reported several times by Keenan to General Foreman Ashley and Foreman England, who in turn talked with Metcalf, Cooper and Turner, directing them to desist from the riding.

Notwithstanding, it intensified, and the bullying so intimidated Keenan that he told Superintendent Hogan on September 27, 1965, that he was frightened and would not continue at the plant. With Management meeting the next morning on the grievance, the taunters were discharged in the afternoon.

Included before the examiner was testimony by Foreman England, who was a union disciple before he was named an acting foreman in July 1965. He stated that Industrial Relations Supervisor Strange had said that because of his union persuasion Metcalf must be relieved. Strange's statement was made in early September, but he did not participate in the discharge decision. The examiner weighed the evidence as preponderant on the side of a discharge for

cause. He noted the leniency of the company in repeatedly admonishing Keenan's tormentors before finally expelling them.

■ Here the Board reversed the examiner, condemning the dismissals as discriminatory and violative of Section 8(a) (3). As with Chavis, the Board saw the threats to Keenan, the ostensible rationale for the firing, as only a guise for a union-prejudiced displacement. Our review of the record compels us to reject the Board's findings. The clear impact of the evidence is that the company was reacting solely to the incessant mocking and menacing of Keenan by the triumvirate. We decline to enforce the Board's order of reinstatement of these employees, for the proof to sustain it is not substantial.

4. The ouster of these three was the genesis of the next unfair labor practice adjudged by the Board. It was the company's refusal to reinstate sympathy strikers, Guevremont, Henchock, J. B. Miller, and Tedford, in the place of their replacements. After attending the morning Management session in which the decision to eliminate Metcalf, Cooper and Turner was made, Foreman England forecast to his fellows in the engine shop that termination of the three was imminent. Thereupon the others in that section pondered group reaction, such as a walkout, if the anticipated expulsions did come about. A remark by England suggesting that the employees stick together gave impetus to the proposed movement.

Closely following upon the actual severances, 13 of the co-employees gathered their tools and assembled in the center of their work area. Employee Smith asked Production Manager Henry, one of the firing officials, if he would listen to the workers' position on the disengagement of Metcalf, Cooper and Turner. Smith stated that if they were fired, his group might as well be fired also. Henry replied that if the employees felt that way they should pick up the tools they then had in hand and leave. Whereupon they checked their tools through the security officer, returning the company's to him. Though refusing a collective interview, Henry granted to each of the protestants an individual conference. Each was told that a job was available for him at LTV, but if he left notwithstanding, he did so of his own volition. Afterwards they signed termination notices, with "personal reasons" checked on the code, and carried away their own tools.

The examiner found the strike of the 13 a protected activity under Section 7, but since the discharges of the three harassers of Keenan were for cause, without more it would amount only to an economic strike, rather than one for unfair labor practices. Accordingly, he held that in these circumstances the participants would be entitled to reinstatement when they offered to return, subject to the employer's right meanwhile to hire permanent replacements. NLRB v. Mackay Radio & Tele. Co., 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). He stressed that they were not dischargeable for striking. Nevertheless, said the examiner, the company had in law discharged them by the procedure adopted by the company in the terminations. In insisting upon the individual interviews, and exacting signed termination notices, the company is found to have abridged the strikers' Section 7 right to engage in concerted and collective action, here the demonstration of disapproval of the employer's treatment of other employees. This company conduct was held to have converted the strike from an economic to an unfair labor practice strike.

The Board believed discussion of the classification of the 13 partisans' separations was unnecessary. Since it had determined the detachments of Metcalf, Cooper and Turner to be discriminatory discharges, the Board considered the strike but a revolt against an unfair labor practice. Thus the examiner and the Board, though by different paths, met in the same conclusion: that upon appli-

cation the strikers, Guevremont, Henchock, Miller and Tedford, were entitled to reinstatement at once, even though they had been replaced immediately upon departing the plant. The company was convicted of violating Section 8(a) (1) and (3) and ordered to reinstate the strikers at once, if they so requested.

■ Despite our opinion that the three were fairly discharged, we agree that their champions were acting in protected concert and could not be discharged; but we do not agree that their termination amounted to a *company* discharge.

■ By taking their tools with them, and going bag and baggage, the employees unequivocally indicated a purpose to end their connection with the company. Had they left their tools and merely walked off, it would be arguable that they were only protesting; but their precipitous behavior evinced a definitive, unconditional resolve to depart without a present intention to come back. It was theirs, not the employer's decision that they leave on these terms. At all events, whether or not this deportment manifested the strikers' decision to end their employment need not be decided. We hold only that it negates the Board's view that the disassociation was impelled and effectuated by the company. Furthermore, discharge by the employer cannot be spelled out of the termination notice; it simply but accurately recorded the circumstances of the separations.

The argument is pressed that an illegal option was given the strikers, viz., that they could either continue in their jobs or quit, as they wished. Under Section 7, the contention is urged, they had a third alternative—to suspend work in protest without relinquishing their employment contracts. This is altogether true, see NLRB v. Mackay Radio & Tele. Co., supra, 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed. 1381 (1938), but adopted here, the proposition does not accord the strikers a right to employment paramount to their successors. Even if they were not dischargeable, by their own act they became replaceable, and their stand-ins not removable at the whim of the strikers.

In any event, the omission is of only academic significance. It was general knowledge that an abundance of similar labor was available; it was plain to the company and to the disaffected group, whether strikers or quitters, that they would be immediately and permanently replaced. Thus the company's characterization of the alternatives open to the dissidents—remaining or voluntarily leaving—was a correct, if inartful, statement of the practical situation.

The order that Guevremont, Henchock, J. B. Miller and Tedford be reinstated in subordination of their supplanters is not justified in the evidence. Whether they are still company employees is not the question before us; we only hold there was not substantial evidence to prove that they were discharged by the company.

5. Unfair labor practices, bottomed on a no-solicitation rule, were laid to the company in dealing with Leadman Thompson, Acting Leadman Vaughn, and Employee K. Miller. NLRB's General Counsel asserted May 12, 1966 as the promulgation date of the rule; the company argued it effective since June 1965. Several employees admitted they had long known of such a ban during company time. The examiner fixed the origin of the regulation as "long prior to May 1966".

■ Leadman Thompson was discharged October 20, 1965, following his solicitation during working hours of a recent employee, Newman, for union membership. In September or early October, 1965, Thompson's attention was personally directed to the rule essentially prohibiting leadmen, who the company was then urging were in fact supervisors, from union enlistment during, be-

fore or after work. On the premise that he was the equivalent of a supervisor, Thompson was explicitly forbidden to treat with the union membership and allies at all. Since, as mentioned earlier, the concept of a management-rationale to warrant this broad taboo could not prevail, neither can a discharge for its violation stand. The restraint was thus an unfair labor practice, a breach of Section 8(a) (3) and (1). The company's ignorance of the directive's invalidity was no excuse. NLRB v. Industrial Cotton Mills, 4 Cir., 208 F.2d 87, 90 (1953), cert. denied 347 U.S. 935, 74 S.Ct. 630, 98 L.Ed. 1086.

█ However, Thompson was fired for solicitation during work hours. The proscription appeared in the impermissibly broad injunction just reviewed, which Thompson had been advised was the only current restriction. The examiner found that Thompson on or after October 18, 1965 had "subjected [a new employee] openly, during working time, to repeated, intensive solicitations to join the Union". The examiner declared the rule was not binding even as a solicitation bar because of its excessive scope and, ergo, Thompson could not be a traverser of an invalid rule. The upshot was that the employer was held disobedient of Section 8(a) (3) and (1), as discouraging union leanings, and was directed to reinstate Thompson with indemnity for any lost wages.

The majority of this court is of the view to uphold this judgment. The author of this opinion cannot accept the reasoning of the examiner, and would not enforce the order of restoration, because the interdiction of working-time solicitation was too well known not to be seen as implied in the broader rule.

█ Acting Leadman Vaughn was fired May 12, 1966 for a second breach of the no-solicitation rule; for the first he had been reproved the day before. He admitted familiarity with the rule. In the termination interview, Vaughn was told he "had done it again", and let go

without the requested further illumination of the accusation. Before the examiner, LTV produced evidence of several on-the-job solicitations preceding May 11, but none afterwards.

The examiner felt he had no evidence to warrant a finding of a post-warning transgression by Vaughn. It is fair to assume that the caution served to save him from an ex post facto discharge. If no subsequent offendings were proved —and we cannot say any were established—the discharge is not sustainable. Hence, the Board's holding that the company had affronted Section 8(a) (3) and (1), and the order for Vaughn's reacceptance and reimbursement should be honored.

Employee K. Miller went to work for LTV on February 2, 1966 and was discharged on August 8. His first foreman was Casadei, after the middle of July it was Robinson. The former talked with Miller about his interest in unionization and Miller disclosed a conviction of its advantages. On or about June 12, at the instance of Casadei, Miller signed a receipt of a notice warning him against disobedience of the no-solicitation rule. The examiner, contrary to the contention of the Board's General Counsel, found the evidence did not establish that the company was "discriminatorily motivated" in giving the warning notice.

█ While Miller was under the supervision of Robinson, he received a performance rating for the period of February 2 to August 1. It was made by Casadei. Although graded as excellent in his work, Miller was described as "difficult" and mention was included of the warning incident. Dissatisfied with this appraisal and asking for an explanation, Miller was told by Casadei that he was considered "unloyal to the company" because of his union preference. The dispraise meant a downgrading of Miller, unfavorably touching upon possible merit wage increases. The examiner found it a violation of Section 8(a) (3) and (1) of the Act, but omitted to provide Miller a remedy for the depressed scoring. In

correction, the Board ordered him reimbursed for the earnings he lost by reason of it. As the examiner and the Board were not without substantial evidence to support these conclusions, we enforce the Board's order.

Board order not enforced in respect to Metcalf, Cooper, Turner, Guevremont, Henchock, J. B. Miller, and Tedford; order enforced in remaining instances.

WINTER, Circuit Judge (concurring in part and dissenting in part):

I agree that Geuvremont, Henchock, J. B. Miller and Tedford, as champions for Metcalf, Cooper and Turner, "were acting in protected concert and could not be discharged," but I dissent from the majority's overturning the Board's finding that they were, in fact, discharged by the company and from the majority's refusal to enforce that portion of the order which would reinstate them with backpay. In all other respects, I join in the majority opinion.

Metcalf, Cooper and Turner justifiably were discharged. As the majority opinion correctly states, this discharge precipitated concerted activity by 13 of their co-employees. When the assembled employees, some of whom had tools in hand, confronted Production Manager Henry, the record is clear that their purpose was to remonstrate what they thought (erroneously, we find) was the unjustified discharge of Metcalf, Cooper and Turner. For practical purposes, Henry refused to discuss the matter. He directed those who did not have their tools to get them and he sent the lot to Joe Strange, the Industrial Relations supervisor. When, collectively, they met with Strange in the personnel office, Strange did talk to each, individually, in the presence of Henry. Prior to talking to Strange, the employees were relieved of the company tools in their possession through a checkout by the security officer.

As the trial examiner found, Strange told each that there was a job for them and that it was Strange's understanding that they were voluntarily quitting. Henchock replied that "if that is what it

is called, that is what I'm doing." Guevremont and Miller responded that they were walking out in sympathy with the dischargees; and Tedford, that he was walking off in protest of the discharges. In the context in which they were made, these responses fell quite short of a manifestation of any intention permanently to resign employment. They were temporary suspensions of work activity in protest of an alleged grievance. At the conclusion of each interview, Strange tendered the employee a "termination notice" which specified as the ground for dismissal "personal reasons." Several days later, when they sought to reclaim their jobs, the strikers were denied reinstatement; they had been replaced on the following day.

While I agree that the strikers were not unfair labor practice strikers, as the Board found (because Metcalf, Cooper and Turner were justifiably discharged), they were economic strikers, engaged in protected concerted activity, as the trial examiner, correctly, in the view of the majority and in my view, found. As such, they were entitled to protection against discharge because of the exercise of their § 7 rights. Simmit Mining Corp. v. N. L. R. B., 260 F.2d 894, 897 (3 Cir. 1958). See, Northern Virginia Steel Corp. v. N. L. R. B., 300 F.2d 168, 174–175 (4 Cir. 1962); N. L. R. B. v. Greensboro Coca Cola Bottling Co., 180 F.2d 840, 843–844 (4 Cir. 1950). Yet the trial examiner and the Board found that the four were *discharged* for this reason; and on this record, I think that finding is unassailable.

The company's representatives unmistakably knew that these workers were protesting what they thought was an unwarranted company decision and were strikers. What the company offered was a choice of abandoning their protected activity or of being considered as having voluntarily quit their employment. In a similar situation, where the employer told a group of employees who walked out in protest against what they considered to be an unfair discharge that "they

had quit and ordered them off the premises," we found an unlawful discharge. N. L. R. B. v. Greensboro Coca Cola Bottling Co., supra, at 843–844. See also, Filler Products, Inc. v. N. L. R. B., 376 F.2d 369, 378 (4 Cir. 1967); N. L. R. B. v. Comfort, Inc., 365 F.2d 867, 874–881 (8 Cir. 1966).

The support in the record as a whole for the correctness of the finding that the strikers were illegally discharged is neither diluted nor overcome by the fact that the employees took their tools with them when they left. In intimating to the contrary, the majority confuses cause and effect. When the employees thereafter left, taking their tools with them, they had been discharged. Such action, rather than "precipitous behavior" evincing "a definitive, unconditional resolve to depart without a present intention to come back" was simply a manifestation of the human reaction to protect one's own property when the company, on whose premises the incident occurred, had evidenced an unmistakable intention to bar them from future access to the premises. If such action on the part of the strikers did not evince such a resolve, it can have no effect in combatting the finding as to the company's action.

Since the finding of discharge was supported, it follows that § 8(a) (1) was violated. See, N. L. R. B. v. Mackay Radio and Tel. Co., 304 U.S. 333, 344–348, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). The argument that, had they been treated as strikers, they could have been immediately replaced from the abundant supply of other workers simply begs the question. The fact is that they were discharged. The appropriate remedy for unlawfully discharged economic strikers is reinstatement with backpay from the date of their application for reinstatement, N. L. R. B. v. Cowles Pub. Co., 214 F.2d 708 (9 Cir.), cert. den. 348 U.S. 876, 75 S.Ct. 110, 99 L.Ed. 689 (1954). Thus, Guevremont, Henchock, Miller and Tedford, having sought reinstatement, are entitled to be reinstated as the Board's order required.