**CONE MILLS CORPORATION,
Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

**No. 12094.**

United States Court of Appeals
Fourth Circuit.

Argued Oct. 11, 1968.

Decided July 16, 1969.

Thornton H. Brooks, Greensboro, N. C., (Thomas C. Cartwright, and McLendon, Brim, Brooks, Pierce & Daniels,

Greensboro, N. C., on brief) for petitioner.

John S. Irving, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Lawrence M. Joseph, Atty., N. L. R. B., on brief) for respondent.

Before BOREMAN, BRYAN and BUTZNER, Circuit Judges.

BOREMAN, Circuit Judge:

Cone Mills Corporation (hereafter Company) seeks review of an order of the National Labor Relations Board (hereafter Board) directing the Company to cease and desist from unfair labor practices found to be in violation of sections 8(a) (5) and (1) of the National Labor Relations Act (hereafter Act); to furnish specific information to the collective bargaining representative of the company's employees (hereafter Union) on pension plans; to rescind a unilaterally instituted pension plan; and to reinstate eight discharged employees to their former positions with backpay, and without prejudice to their seniority or other rights and privileges.

The Board adopted the Trial Examiner's recommendations in part, finding that the Company had violated section 8(a) (5) of the Act by withholding relevant information from the Union with respect to a pension plan proposed by the Company and by unilaterally putting the plan in operation, and had violated section 8(a) (1) of the Act by discharging eight employees who were protesting the discharge of another employee. The Board expressly disagreed with the Examiner's findings of a section 8(a) (3) and (1) violation in the discharge of employee Ralph Johnson and of a section 8(a) (5) violation allegedly resulting from bad faith bargaining with respect

to union security. The Board also found, as did the Examiner, that the Company had not interfered with, restrained and coerced its employees in the exercise of rights guaranteed in section 7 of the Act by statements made by company supervisors and agents at three of the plants.[1] We uphold the board's determination that the Company unlawfully refused to provide information requested by the Union but deny enforcement of the order requiring reinstatement of the eight discharged employees.

Cone Mills Corporation owns and operates seven textile processing, printing and finishing plants in the area of Greensboro, North Carolina. Separate locals of the Textile Workers Union of America, AFL–CIO, have been the collective bargaining agents of the employees for many years. The union contracts at these seven plants terminated and were inoperative between October 1962 and October 1965. During this three-year period the parties continued their relationship without the benefit of a written contract. Bargaining on a new contract separately for each plant began during the period from May to November 1965.

During these negotiations the Union sought a pension plan for all production employees. When the first negotiations began at the Edna Plant in Reidsville, the Union presented its first pension plan proposal. This proposal was received for study by the Company but was not accepted. In place thereof, the Company, on September 29, 1965, submitted a counter-proposal for a company-wide pension plan.[2]

At a bargaining session on October 4, 1965, the Union criticized the company plan based on the level of benefits provided thereby and in turn submitted another proposal. The Company, however, rejected the criticisms of its plan of-

---

1. The determinations of the Board as to the discharge of Ralph Johnson, union security, and interfering with, restraining and coercing employees are not before this court for review.

2. The Union did not learn until mid-November 1965 that this proposed plan was to become effective on January 1, 1966.

fered by the Union, insisting that the company plan was a good one and that there was not a better noncontributory plan provided by any of its competitors.

After six additional bargaining sessions in October in which the Union sought adoption of various other pension plans, the differences between the parties over pension benefits narrowed. Consequently, on November 9, 1965, the union's expert on pension plans accompanied the union's Regional Director to the negotiations. It was at this session that the Union first requested information as to the costs of the company plan and the actuarial assumptions upon which it was based. The Company refused this request stating that the cost of its plan was estimated to be about $.05 per hour and that the Union did not need the actuarial assumptions since the employee benefits were the only matters of concern. At subsequent bargaining sessions this request for specific information was renewed by the Union and each time it was denied.

On November 15, 1965, the Company advised the Union that it needed prompt approval of its proposed pension plan since it intended to put the plan into effect on January 1, 1966, and desired to first obtain the approval of Internal Revenue Service. At this time the Union's Regional Director wrote to the Company and requested specific information concerning the cost of the plan so that a counter-proposal could be formulated and submitted. Having received no reply to this letter by December 3, 1965, the Regional Director again, by letter, requested the actuarial information and advised the Company that its actions amounted to a refusal to bargain, in violation of the Act. On January 1, 1966, the company's plan was put into effect and it has remained un-

changed. The Union filed the refusal to bargain charge on June 2, 1966.

The Board's finding that the company's refusal to furnish specific information on the proposed pension plan was a violation of 8(a) (1) and (5) is amply supported by the record as a whole. It appears that the Union initially requested the actuarial information on November 9, 1965, one month after the first negotiating session on the company's proposed plan and within a reasonable time after it appeared that the Company would consider no proposals which were based on data other than that upon which its plan was based.[3] The Union continued its requests for information at subsequent bargaining sessions on November 10 and 11 and by letters dated November 15 and December 3, 1965, after its initial request had been denied. When the Company unilaterally put its plan into operation it was still the subject of negotiation.

The Company initially contends that consideration of the alleged 8(a) (1) and (5) violation is barred by section 10(b) of the Act since the charge was not filed until June 2, 1966, and the initial request for information was made on November 9, 1965, more than six months prior to the date the charge was filed. We find no merit in this contention since the Company disregards the fact that the same request was repeated from time to time after November 9, 1965, and within the period of six months prior to the charging date. Unlike the case of Local Lodge No. 1424 I. A. M. v. N. L. R. B., 362 U.S. 411, 80 S. Ct. 822, 4 L.Ed.2d 832 (1960), where there was only one event relied upon to support a charged violation occurring outside the six-month limitation period, and where the Court rejected the "continuing violation" theory, the instant

3. The Union attempted to make additional proposals without requesting such information on October 4 and 12, 1965, but both of them were rejected. On October 12 the Union began to bargain for any of three other pension plans with which the company's plan had been unfavorably compared. The Company, in rejecting these plans, reiterated that its plan "was a good one" and that "there was not a better non-contributory plan among any of the competitors."

case involves a repetitive succession of events occurring within a period of six months prior to the filing of the charge.

The Company further argues that the information requested by the Union was not needed and that this lack of need was shown by the fact that proposals from the Union were forthcoming after September 29, 1965, the date when the Company first presented its proposed pension plan; that the request, even if it were valid, was made only to "hinder and impede the process of collective bargaining" since it was made late in the year and with the knowledge that the Company desired to put the plan into operation on January 1, 1966, after first submitting it to Internal Revenue Service for approval.

In contending that the union's submission of plans after September 29 shows a lack of need for the requested information the Company overlooks the fact that the union proposals were not based on the company's proposal. The union proposal which was submitted on October 4, 1965, was in the process of being drafted prior to the submission of the company's plan and obviously could not have been based upon it. The other union proposals which were discussed on October 12, 13, 19, and 27 were assertedly based on pension plans which had been negotiated by the Union at plants of other employers and which were more favorable to the employees than the plan proposed by the Company. It was after these negotiating sessions in October that the Union concluded that meaningful negotiations could proceed only after an examination of the actuarial data upon which the company plan was based. These subsequent proposals by the Union of plans which were unrelated to the proposed plan submitted by the Company did not necessarily indicate a lack of need for the requested actuarial information.

■ The Union, in its representative capacity, has an affirmative duty to intelligently evaluate all employee benefits for which it is negotiating. Consequently, it is an unfair labor practice within the meaning of the Act for an employer to refuse to furnish such information as is necessary to the proper discharge of this duty. See N. L. R. B. v. Truitt Mfg. Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956); and N. L. R. B. v. Whitin Machine Works, 217 F.2d 593 (4 Cir.1954), cert. denied, 349 U.S. 905, 75 S.Ct. 583, 99 L.Ed. 1242 (1955). When the Company takes a firm and inflexible stand with respect to such a proposal, and is attempting to force the acceptance of that proposal by the Union, this "need" for pertinent information becomes even more apparent.

■ We cannot agree with the company's contention that the Union's request for information was made to "hinder and impede the collective bargaining process." As the Board correctly noted, the urgency surrounding the need for approval of this plan by the Union obviously was created by the Company itself, so as to pressure acceptance. The plan did not have to be made effective on January 1, 1966, for any special reason, and the prior approval of the plan by the Internal Revenue Service was not a requirement (or otherwise needed to gain any tax advantages). Indeed, as the evidence reveals, this plan was not approved by Internal Revenue Service until late May 1966. In addition, this asserted need for approval was not brought to the attention of the Union until November 15, 1965, several days after the date of the union's first request for information. Consequently, we find no merit in the company's charge of bad faith bargaining tactics by the Union.

■ In these circumstances the unilateral imposition of the plan while negotiations were still being conducted was a violation of section 8(a) (5) of the Act. N. L. R. B. v. Katz, 369 U.S. 736, 743, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). If, as the Company claims, an impasse with respect to this proposal

had been reached, it would have been entitled to institute the plan without the approval of the Union, N. L. R. B. v. Crompton—Highland Mills, 337 U.S. 217, 225, 69 S.Ct. 960, 93 L.Ed. 1320 (1949). However, as *Crompton* emphasizes, there can only be an impasse after there has been *good faith* bargaining on behalf of the Company. Because the Company refused to furnish requested relevant information, a reasonable opportunity to bargain by the Union, as required before a legally cognizable impasse can be reached and unilateral action taken, was not presented. *See* Industrial Union of Marine & Shipbuilding Wkrs. of America, AFL–CIO v. N. L. R. B., 320 F.2d 615, 621 (3 Cir.1963), where the court stated, "it is manifest that there can be no legally cognizable impasse, i. e., a deadlock in negotiations which justifies unilateral action, if a cause of the deadlock is the failure of one of the parties to bargain in good faith." See also N. L. R. B. v. Herman Sausage Co., 275 F. 2d 229, 234 (5 Cir.1960). The duty to bargain in good faith encompasses the duty to furnish information. N. L. R. B. v. Item Company, 220 F.2d 956 (5 Cir.1955); N. L. R. B. v. Whitin Machine Works, 217 F.2d 593 (4 Cir.1954).

## DISCHARGE OF EMPLOYEES

We next consider the discharge of the eight employees at the Proximity plant who stopped work and refused to return to their jobs, assertedly protesting the previous discharge of a fellow employee.

At this plant a dispute had arisen among the three-man crews of the printing machines. Each machine was operated by a crew of two tenders and one printer and the tenders were complaining that the printers were not performing their work properly which resulted in an increased workload for the tenders. This culminated in the filing of a grievance and in a called one-day "holiday" in April 1966. Thereafter, meetings were held by company representatives with these teams on May 11, 1966, and it was agreed that a greater effort would be made by all concerned to keep busy during the color and roller changes on these machines. On the following day, May 12, 1966, Ralph Johnson, a tender on machine No. 3, was discharged for conduct which was considered by the Company as hindering the resolution of this longstanding dispute.[4] As Johnson left the plant, other employees learned of his discharge. At a designated hour, by prearrangement, a number of employees, found by the trial examiner to be fifteen or twenty, called a work stoppage.

Assistant manager Wright was promptly informed of the work stoppage and went to the scene. Wright first spoke to employee Noah Lewis, the union's steward, because, as Wright expressed it, he figured the union steward would know what was going on. The Trial Examiner found that, in answer to Wright's inquiry if the men were on strike, Lewis said that they were "protesting the firing of Ralph [Johnson] * * *. We want you to put him back to work right now," and suggested further, "Now Joe, why don't you talk to some of the boys in here, and we can get this thing settled right off, and talk to the management just a little bit." As further found by the Examiner, Wright answered "I ain't got no time for that now," and added, "We have a regular grievance procedure to handle this sort of thing and we will not put him [Johnson] back to work right now." Wright requested Lewis to get the men back to work. Wright then asked, "Noah, are you on strike? If you are on strike, you have to leave the plant and if you don't leave the plant or go back to your job, then I'll have to discharge you."

4. The Board, in overruling the Examiner, found that there was "an insufficient showing that the Respondent, in discharging Johnson, was unlawfully motivated * * *. Johnson's flippant 'prove it' response [to the Company's accusation that he was coming in early and stirring up 'trouble' with employees working on the third shift] * * * offered ample legitimate reason for discharge * * *."

Lewis again stated that the men were protesting the discharge of Johnson. Lewis was thereupon discharged by Wright.

Employee Tingen heard Wright discharge Lewis and promptly stated "If you fire Noah, you're going to have to fire me too." Tingen was then discharged and the two discharged employees were escorted out of the plant. Some of the group then returned to work while others remained standing in the corridor between machines, some of which were stopped and some of which were still running. Further, according to the Trial Examiner, Wright then spoke individually with each of the following employees: Eugene Henley, Edward Dick, Ronald Gardner, Lester Flippin, Alfred Walker, and Jack Wells. The Board argues that these conversations were all similar and about as described by employee Gardner as shown below.[5] When Wright told Henley to "go back to work" Henley responded, "Well, I'm protesting. I'll go back to work as soon as this wrong that I feel has been committed is right." Wright then ordered Henley to leave the premises and, in Henley's words, he replied "I told him I would have to be evicted." When Wright asked employee Gardner to leave Gardner told Wright that he "was going to stay until 3 o'clock, at the regular quitting time." It was following this response that Gardner was discharged. When Wright told employee Dick to go back to his job or he would have to discharge him, Dick replied, "I couldn't go back after they had fired all my friends." Wright then discharged him.

Actually, Henley, Gardner and Dick, after they were discharged, undertook to return to their machines but just about the time they reached their machines police officers, who had been called, arrived in the plant. Ben Thornburg, superintendent of the plant, pointed out Henley, Gardner and Dick and said he wanted them arrested for "trespassing." The officers arrested the three upon Thornburg's assurance that he would appear at the police station to sign warrants for the arrests. The trespassing charges which were filed against these employees were later dropped, assertedly because the warrants were improperly drawn.

While it is true that the contract between the Company and the Union had expired prior to these occurrences, it appears that the parties continued their relationship without the benefit of a written contract. As hereinbefore shown, the start of this trouble which led to the discharge of Johnson was a dispute which had arisen among crews of the printing machines. Despite the absence of a formal contract, a grievance was filed and it is clear that the regular grievance procedure was then being recognized as in effect except the final step which provided for submission to arbitration. The filing of this grievance in April of 1966 culminated in an agreement which appeared to satisfy the parties involved. On the very day of these discharges, shop steward Lewis had a dispute with Wright as to whether Lewis should carry out instructions to wash rollers which he claimed was not part of his job, and yet Lewis agreed to carry out his supervisor's orders, saying, "Okay, I'll do this until we can file a grievance and get this thing settled, * * *." Lewis testified that as shop steward he had handled grievances during the existence of the contract and after its termination.

Neither the Board nor the Examiner made a finding that a grievance procedure did not exist because such a finding would have been contrary to the

---

5. [Wright] said, "What's going on?" and I said, "We are protesting Ralph Johnson's job" and he said "Well, is this a strike?" and I said, "No." He said, "What are you doing?" and I said, "I'm protesting." He said, "Why don't you go back to work?" and I said, "I will when the rest of the fellows does," and he said, "You are terminated."

record. The most that the Examiner found in this respect was that "Wright was highly indefinite as to whether Respondent still honored the arbitration provision of that prior contract." In its brief, the Company admits that there was no arbitration provision in effect in May of 1966 because there was no contract in existence which an arbitrator could interpret and apply. However, the record shows that a "grievance procedure" was recognized by the parties as then in effect. The employees here involved had a right and an opportunity to have their protest or grievance heard and considered by top management through orderly channels at a later time. But they were not interested in being heard. They had planned in advance to stop production for thirty minutes in protest of the discharge of Johnson, according to their own testimony.

On this aspect of the case the Board presents its arguments by the device of setting out the testimony of one employee (Gardner) and then characterizing the same as "essentially the same conversation [by assistant manager Wright] with each" of the protesting employees. However, the unequivocal testimony of two discharged employees corroborated the testimony of Wright.[6]

In its Decision and Order, the Board treated the discharges of the eight employees in one paragraph as follows:

Finally, the Trial Examiner found that Respondent violated the Act by discharging eight employees for participating in a one-half hour, in-plant "protest" of Ralph Johnson's discharge. Concerted action to protest the discharge of a fellow employee is, of course, a protected activity. Hence, we adopt the Trial Examiner's

finding that Respondent's discharge of the eight protesters violated Section 8(a) (1) of the Act.

In its contentions before this court the Board claims that, with respect to employees Gardner, Henley, Dick, Walker, Wells, and Flippin, the record does not support the company's contention that these employees were afforded an opportunity to return to work or carry on their protest outside the plant. On the contrary, board's counsel argues, the Board adopted the Trial Examiner's finding that these employees were discharged immediately after Wright asked each why he did not go back to work. The Board made no analysis of the Examiner's decision or findings on this point, merely stating in two sentences its adoption of a conclusory finding. The statement of this court in N. L. R. B. v. Stevenson Brick & Block Company, 393 F.2d 234, 237 (1968), is pertinent here:

While the Board, failing to exercise its independent reviewing power, was content to accept this conclusion of the Trial Examiner, we are unable to do so because it was derived in part from a palpable misinterpretation of certain testimony and a disregard of other evidence directly bearing thereon.

Board counsel attempts to supply findings which the Examiner and the Board failed to make. But courts may not accept appellate counsel's *post hoc* rationalizations for agency action and an agency's discretionary order will be upheld, if at all, on the same bases articulated in the order by the agency itself. To be sustained on judicial review, administrative action must contain both adequate findings and substantial evidence to support them. Burlington

---

6. From the testimony of employee Wells:
Q. What all did you and Mr. Wright have to say to one another then?
A. Well, he wanted to know if we were on strike and I said, "no, we are protesting." And he said, "If you are on strike go on outside," and I said, "No we are just protesting."

From testimony of employee Flippin:
Q. I understood you to testify a minute ago that when Mr. Wright came up to the protest group and talked with you individually he said to you about the same type of things that Mr. Wells has just testified. Is that correct?
A. That's correct.

Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). The Board and the Examiner have misinterpreted the testimony of some board witnesses and have disregarded the testimony of others. The Examiner did not reject the testimony of Wright but, at times, rather relied on it. The testimony of employees Wells and Flippin corroborates Wright as to the instructions he gave the protesting employees. Wright testified that he told all of these involved employees, collectively and individually, that they should either go back to work or leave the plant and that they would be discharged if they did neither. Some of the employees testified that Wright told them exactly what Wright claimed they were told. The Trial Examiner found that two of them were, indeed, told that they should leave the plant or suffer discharge. But two others admitted that they were so instructed and any finding to the contrary is clearly erroneous. As to the others involved it appears that they were all in one group, Wright spoke to them collectively and then individually, and the record clearly reflects that the remarks addressed to certain individuals were overheard by others.

Lewis was the department shop steward and was acting as the representative of the employees when the trouble started. It was known to Lewis and also to assistant manager Wright that a formal grievance procedure was available to the employees. Wright first contacted Lewis as the representative of and the spokesman for the group. In its brief, the Board states "In the circumstances of this case, any refusal by these employees to leave the plant was not so indefensible as to remove them from the protection of section 7." It has been held that concerted action to protest the discharge of a fellow employee is a protected activity and it has been held in cases where the strike activity did not occur on the premises of the employer that protesting employees cannot be dis-

charged for engaging in such concerted activities. In its formal decision the only case cited by the Board to support its statement that "concerted action to protest the discharge of a fellow employee is, of course, a protected activity" is Summit Mining Corp. v. N. L. R. B., 260 F.2d 894, 897 (3 Cir.1958). But there the employees who were held to be protected left the plant to conduct the protest.

The Examiner, in support of his conclusions, cited Golay & Co. v. N. L. R. B., 371 F.2d 259 (7 Cir.1966), and in argument before this court on appeal board counsel seeks support from that decision to sustain the board's position here. It is contended that the court in *Golay* held that, when employees are striking on company property, it is *unlawful* to instruct them to resume work or be discharged, but *lawful* to instruct them to resume work or leave the plant and engage in the strike activity off of company property; and, if neither of these *lawful* alternatives is acceptable the employees will be subject to discharge. However, from a careful reading of *Golay,* the review of the findings of fact by the Examiner, the disposition of the case by the Board, and from the court's opinion it appears that the court, in fact, upheld the discharge of several employees who had been engaged in an in-plant "work stoppage" for more than a minimal time prior to their discharge; and it does not appear that each of these discharges was preceded by a warning to the employee to either strike off of company property or be discharged.[7] Many employees were merely asked to return to work and upon refusing to do so or standing mute they were released.

Recently this court, in LTV Electrosystems, Inc. v. N. L. R. B., 408 F.2d 1122 (4 Cir.1969), recognized the principle that concerted activity in protest of the discharge of fellow employees is protected, citing N. L. R. B. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). But

---

7. See the intermediate report and recommended order of the Examiner, 156 NLRB 1252.

in *LTV Electrosystems, supra,* the majority held that the protesters, who left the plant, voluntarily quit their employment and were not discharged.

In the instant case all of the protesting employees indicated their objection to the discharge of their fellow employee, Johnson, and their sympathy for him, by engaging in a planned work stoppage. Their union representative and spokesman demanded that Johnson be immediately reinstated which demand was rejected. They had thus made their point and had registered their complaint. The Company was not informed as to the proposed duration of the work stoppage; in fact, Henley stated that he would go back to work when the wrong which he felt had been committed was righted and that he would not leave the plant, as ordered, unless evicted.

The record is clear that a number of the protesting employees returned to their machines when requested to do so. They were not discharged for participating in the protest. Those who remained away from their work exhibited a defiant and rebellious attitude. Substantial evidence indicates that they were told to return to work or leave the premises and they refused to do either. We think management made a reasonable distinction between protesters who abandoned their work stoppage and returned to their machines and those who defiantly insisted upon carrying on and prolonging the work stoppage on company property during working hours.

Few rights, including the right to strike in protest, exist without corresponding duties and obligations to those against whom the right is being asserted. When one attempts to exercise a claimed right he cannot, in all fairness, disregard his corresponding duty and obligation with impunity. We conclude that the Company was not in violation of section 8(a) (1) of the Act in discharging the eight employees and we deny enforcement of the board's order to reinstate them.

Enforcement granted in part and denied in part.