**UNITED MERCHANTS AND MANU-FACTURERS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 76–1465.**

United States Court of Appeals, Fourth Circuit.

Argued Nov. 10, 1976.

Decided May 9, 1977.

Joe H. Clark, Atlanta, Ga. (David M. Vaughan, Elarbee, Clark & Paul, Atlanta, Ga., on brief), for petitioner.

Joseph P. Norelli, Atty., N. L. R. B., Washington, D. C. (John S. Irving, Jr., Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Jay E. Shanklin, Atty., N. L. R. B., Washington, D. C., on brief), for respondent.

Before BRYAN, Senior Circuit Judge, WINTER, Circuit Judge, and FIELD, Senior Circuit Judge.

WINTER, Circuit Judge:

On petition for review and cross-petition to enforce an order of the NLRB remedying the discharge of fifteen coding section employees, we must consider whether substantial evidence supports the Board's findings that the employees were discharged because they engaged in a protected walkout and that a brief work stoppage which preceded the walkout was protected concerted activity for mutual aid and protection. Finding such evidence, we grant enforcement.

I.

The evidence supporting the Board's ultimate findings follows:

United Merchants and Manufacturers, Inc. employed approximately forty unorganized employees of Filipino extraction in the invoice coding section of its Los Angeles plant during the evening shift. On April 8, 1975, supervisor Donald Beska called one of these employees, Rosemary Mendoza, into his office and, notwithstanding that it was customary for employees in the coding section to sign out for one another, he discharged her for having another employee sign out for her. The employee who signed out for Mendoza was also discharged. Another employee, Clarita Garcia, overheard Beska's discharge of Mendoza and reported it to the employees in the coding section, who decided to appeal the discharges but agreed to wait until Mendoza talked to the department manager, Baska's immediate supervisor, to see if he would overturn Beska's decision. The department manager, David Wronski, upheld Mendoza's discharge, and Mendoza returned to the coding section and told the employees of Wronski's action.

The coding clerks then stopped work and grouped in the office area to discuss the discharges. Beska told the employees to return to work but they refused and continued talking among themselves. Wronski instructed Beska to tell the coding clerks to go back to work or sign out and leave, and Beska did so. The employees ignored these directions and continued to discuss their future actions. The employees decided to designate Garcia to appeal the discharges to Beska. Beska reaffirmed his decision, and the employees sought a hearing with Wronski. Wronski agreed to talk to a representative of the employees, and Garcia was chosen. While Garcia was in Wronski's office, Beska continued to tell the employees to go back to work, but the majority refused and the work stoppage continued.

Meanwhile, Garcia, who was in Wronski's office, told him that the employees felt so badly about the discharges that there might be a walkout. Wronski still upheld the discharges. While Garcia was in the office, Beska entered the office and informed Wronski that the work stoppage continued, whereupon Wronski told him to "take the cards of those who walk out and terminate them."

Garcia then returned to the group of employees and informed them of Wronski's decision. The work stoppage had lasted twenty-five minutes at this time. Beska, in response to a request from Garcia, gave permission for the employees to take a break to discuss their action. The employees agreed to walk out for one night to protest the discharges and return the next night. As the employees left the meeting, Beska repeatedly told them "[i]f you leave tonight, you will be terminated—so don't come back anymore." Only fifteen employees still walked out.

That night a number of the fifteen communicated with each other, and it was decided that Anita Dungca, who had an exemplary work record, would seek reinstatement at the start of work the next day as representative for that group. The others would meet her there and would apply if she were reinstated. Dungca went to Beska's office at 4:15 p. m. the next day and sought reinstatement. Beska denied reinstatement, telling her that Wronski had ordered the employees who walked out terminated. Dungca went to the other employees and told them there was no point in their returning to the plant since Beska had shown her a list of names of those who had walked out, and they were also terminated.

Work on the night of the walkout was completed by the employees who did not walk out, and employees recruited from other sections. The next day the company obtained fifteen replacements from an employment agency and utilized part-time employees to do the work of the fifteen.

In the weeks after an unfair labor practice charge was filed, four employees were offered reemployment and accepted. The employees who walked out were carried on the payroll which was prepared the following month, and no termination notices were ever sent to them even though it was the employer's practice to do so.

The Board concluded, on this record, that the work stoppage preceding the walkout was concerted activity protected by § 7 of the Act and that the employer had violated § 8(a)(1) of the Act by terminating the fifteen employees for engaging in a protected walkout. *Inter alia*, it ordered immediate reinstatement and back pay.

## II.

■ A concerted work stoppage and walkout by unrepresented employees for their mutual aid and protection is protected by § 7 of the Act. *NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 14–17, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962); *NLRB v. Hanes Hosiery Division*, 413 F.2d 457, 458 (4 Cir. 1969); *NLRB v. Greensboro Coca Cola Bottling Co.*, 180 F.2d 840, 843 (4 Cir. 1950). Irrespective of the employer's right to discharge the two employees for the time-card infraction, the employees had a right to protest the discharge of their fellow employee by appropriate means, including a strike. *LTV Electrosystems, Inc. v. NLRB*, 408 F.2d 1122, 1127 (4 Cir. 1969); *NLRB v. Greensboro Coca Cola Bottling Co.*, 180 F.2d 840, 843 (4 Cir. 1950).

■ We see no need to argue the facts. There was substantial evidence to support the Board's findings that the employees were discharged solely because of the walkout. Beska repeatedly told them that if they left they would be "terminated" and "don't come back." Irrespective of Beska's general authority to discharge employees, the record shows that Wronski had instructed Beska to "take the cards of those who walk out and terminate them"; and the next day, when Dungca sought reinstatement, Beska told her that she had been terminated on "an order by Mr. Wronski." We give no credence to the employer's argument that Beska's choice of the word "terminate" was merely an inappropriate

choice of words to convey the thought that the employees would be replaced so as not to create a disruption in the employer's business. In the instant case, unlike *Redwing Carriers, Inc.*, 137 N.L.R.B. 1545 (1962), *enforced sub nom., Teamsters Local 79 v. NLRB*, 117 U.S.App.D.C. 84, 325 F.2d 1011 (1963), *cert. denied*, 377 U.S. 905, 84 S.Ct. 1165, 12 L.Ed.2d 176 (1964), on which the employer principally relies, the employees, except for four, were not given an opportunity to return to work and the employer did not solicit their return. Indeed, when Dungca initially sought to return to work, she was refused and she was told that all employees who had walked out had been terminated.

### III.

■ Having concluded that substantial evidence supports the Board's finding that the employees were discharged solely because of their walkout, we must still determine whether the work stoppage prior to the walkout was so flagrant as to remove the employees from the protection of the Act. *NLRB v. Fansteel Metallurgical Corp.*, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627 (1939); *Elk Lumber Co.*, 91 N.L.R.B. 333 (1950).

In *Cone Mills v. NLRB*, 413 F.2d 445 (4 Cir. 1969), we held that eight employees who stopped work protesting the discharge of a fellow employee did not engage in protected activity and, as a consequence, could be discharged. The department shop steward who led the work stoppage knew that a grievance procedure was available to the employees and was advised by the assistant manager to utilize that procedure. The assistant manager also requested the shop steward to get the men back to work. When the steward refused to go back to work, he was told either to leave the plant, go back to work, or he would be discharged. Declining to do the first two, he was discharged. Other employees who were given a similar choice and who followed the steward's example were also discharged. Some of these employees stated they would not return to work until the shop steward was

rehired, and another employee indicated he would have to be evicted in order to be forced to leave.

We think that *Cone* is inapposite here. Unlike the employees in *Cone*, the employees in the instant case were not occupying the premises in defiance of the employer's rights, nor were they evincing a "defiant and rebellious attitude." *Cone*, 413 F.2d at 454; *NLRB v. Pepsi Cola Bottling Co.*, 449 F.2d 824, 829 (5 Cir. 1971), *cert. denied*, 407 U.S. 910, 92 S.Ct. 2434, 32 L.Ed.2d 683 (1972) (interpreting *Cone*). The employees here were unrepresented employees who did not have a grievance procedure to utilize. They therefore had resort only to other means to communicate their grievance. Appealing to their supervisors was one. Their conduct only lasted during the time that discussions with the employer were being carried on, and they were attempting to agree on their future actions. There were never any threats of violence by the employees, nor did the employees attempt to interfere with the job performance of other workers. We thus cannot deem the twenty-five minute work stoppage prior to the break as being in reckless disregard of the employer's rights when the employees were not attempting a confrontation with the employer but only attempting to determine how to proceed.

In distinguishing *Cone*, we think it significant also that after the work stoppage the employer gave the employees a break "further [to] discuss the problem." The employer apparently did not view the employees' acts to be so outrageous as to preclude their continued employment if they decided to go back to work after the break, and the work stoppage did not preclude the employer from not discharging the workers who did not subsequently walk out. *Cf. Confectionary Drivers and Warehouseman's Local 805 v. NLRB*, 312 F.2d 108, 112–13 (2 Cir. 1963); *Jones & McKnight, Inc. v. NLRB*, 445 F.2d 97, 103 (7 Cir. 1971) (condonation of employees' acts is intent on part of employer to overlook misconduct and resume employment relationship). Therefore, we think that the Board was justified in concluding

that the work stoppage was also protected activity and not a proper basis for employee discharges, and that these conclusions have substantial evidentiary support.

*ENFORCEMENT GRANTED.*

ALBERT V. BRYAN, Senior Circuit Judge, dissenting:

For me the decision of the National Labor Relations Board is unacceptable as wanting in evidence to uphold it and as abrogative of the principles laid down by this court in like instances of strikers' refusal to leave the employer's work area.

By way of preface, I mention that the Board itself concluded that the discharge of the two employees—Mendoza and Valbuena—for signing out the other's time card was not an unfair labor practice. Replying to Mendoza's charge of a violation by the employer of section 8, NLRA, 29 U.S.C. § 158, in her termination, the Regional Director wrote her that "further proceedings are [not] warranted" and "[T]here is insufficient evidence . . . to controvert the employer's assertion that you and Zenaida Valbuena were discharged for cause rather than for any protected concerted activity." General Counsel reviewed his action, and denied her appeal for the same reasons. These facts are not now noticed by the Administrative Law Judge or the Board.

In his letter the Director also observed that his decision did not affect her additional charge "that the 15 employees who walked out of work on the evening of April 8, 1975, to protest the discharge of yourself and Valbuena were themselves illegally discharged in violation of section 8(a)(1) of the Act . . . ." Thus all the protesting employees were protesting a lawful discharge.

Concerted action taken in protest against lawful discharges of fellow employees is nonetheless protected activity under section 7, NLRA, 29 U.S.C. § 157, and as a general rule the discharge of such protesting employees is an unfair labor practice under section 8 of that Act. Be that as it may, the facts found by the Board disclose to me that the employees who declined to *leave*

the coding section in their protest were permissibly discharged. The protected nature of a protest derives primarily from its purpose. However, *employee misconduct* —such as this unnecessary and serious interference with business operations—denudes a protest of its protected status despite merit originally in purpose.

The facts here reveal an unwarranted disruption by the defiants. Mendoza refused to recognize her lay-off, and the Supervisor had to remove her things from her desk. When the others in the coding section heard Supervisor Beska release Mendoza, some 40–45 of them congregated in the area and decided to appeal her disemployment, but awaited the result of Mendoza's submission of their protest to the Manager. In conference with her, he sustained the Supervisor's order. Upon learning of the Manager's reaction, all of the coding clerks stopped work and gathered in that space discussing the two dismissals. With this hindrance none of those desiring to do so could resume their work.

The effect was a significantly hurtful retardation of the Company's operations. The coding consisted of the preparation of an average of 26,000 forms per day for computer use by those with whom the Company had contracts to do so. The forms had to be finished by 11:45 o'clock each night, and any delay during the shift from 5:00 o'clock until the delivery hour seriously hampered the scheduled production and created a substantial impact upon the Company's economy.

With this in mind, the Supervisor requested that the employees resume their work. They refused, and persisted in standing and talking with each other. Aggravating the confusion was the circumstance that 35 of them were Filipinos speaking in their native tongue.

Next, the Manager instructed the Supervisor to tell them again to go back to work or else to sign out and *leave.* The Supervisor relayed this message to the employees. For the second time, they ignored these instructions, with unremitting discussions,

and so impeded the dispatch of the tasks of the section. They named one of their number to approach the Supervisor and ask for a hearing by the Manager. Their desire was honored, with the stipulation that he talk to a representative. Meanwhile the Supervisor for a third time told the employees to resume their work or *leave*, yet commotion prevailed throughout and the assemblage continued. Some stood on their desks, others sat on them.

While the representative conferred with the Manager, she intimated that there would be a walkout. At that time the Supervisor entered the office and reported that the protesters were still congregating in the coding space. Repeated directions to return to their posts did not end the defiant and idle occupancy of the section. The coding area had been taken over and occupied by non-workers, with suspension of all possibility of work for 25 minutes.

The blockage of all functioning of the section was unjustified and warranted the Company in discharging them. Their protests had been received, deliberately weighed and promptly answered. It was their duty then to leave the area. The right of protest conceded, employees cannot disrupt the work area in demonstration of their protestations. This canon of conduct was violated here, for the strikers did not leave the coding section until the Supervisor let them go into the cafeteria.

An almost identical analogue to this case is *Cone Mills Corp. v. NLRB*, 413 F.2d 445, 450–51 (4 Cir. 1969). There 15 to 20 employees called a work stoppage in protest of the discharge of a fellow-worker. A typical experience of the manager, Wright, with one of the workers was recounted in the opinion in this way:

"Wright then asked, 'Noah, are you on strike? If you are on strike, you have to *leave* the plant and if you don't leave the plant or go back to your job, then I'll have to discharge you.' Lewis again stated that the men were protesting the discharge of Johnson. Lewis was thereupon discharged by Wright.

". . . Some of the group then returned to work while others remained standing in the corridor between machines, some of which were stopped and some of which were still running." (Emphasis supplied.)

Eight employees in all were terminated in this way; they had remained at their locations in the plant for approximately a half-hour. The parallel of the situation here and the applicable law were squarely laid out in the opinion of Judge Boreman:

"The record is clear that a number of the protesting employees returned to their machines when requested to do so. They were not discharged for participating in the protest. *Those who remained away from their work exhibited a defiant and rebellious attitude. Substantial evidence indicates that they were told to return to work or leave the premises and they refused to do either.* We think management made a reasonable distinction between protesters who abandoned their work stoppage and returned to their machines and those who defiantly insisted upon carrying on and prolonging the work stoppage on company property during working hours.

"Few rights, including the right to strike in protest, exist without corresponding duties and obligations to those against whom the right is being asserted. When one attempts to exercise a claimed right he cannot, in all fairness, disregard his corresponding duty and obligation with impunity. We conclude that the Company was not in violation of section 8(a)(1) of the Act in discharging the eight employees and we deny enforcement of the board's order to reinstate them." (Emphasis supplied.) 413 F.2d at 454.

Nor was this principle waived presently by the failure of the Company to discharge the remainder of the protesters. This omission was doubtlessly dictated by a business judgment to meet the deadlines of production. In any event the employees can hardly complain of the tolerance. Actually, the Board's decision faults the Company for its restraint in not discharging all obstructive employees as soon as the Company had the right to do so.

In *NLRB v. Clearfield Cheese Co.*, 213 F.2d 70 (3 Cir. 1954), a Board order to reinstate discharged striking employees was modified to exclude compulsory reinstatement of 21 employees guilty of picket line misconduct. The Board had ruled that voluntary reinstatement of some of the guilty waived the company's right to deny reinstatement to any in that group. The Court, overturning this ruling held:

"[W]here the employer sees fit to waive its rights to terminate because of misconduct the employment of particular employees it can hardly be assumed to have foreclosed itself from rejecting any other employees in the same category." 213 F.2d at 75.

Compulsory reinstatement of the offending 21 was denied.

The present case and *Cone Mills* are akin, and the outcome here is controlled by our earlier decision. It should not now be abandoned.