**S & W MOTOR LINES, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

**Teamsters Local Union No. 391, Intervenor.**

**No. 79–1147.**

United States Court of Appeals, Fourth Circuit.

Argued Jan. 9, 1980.

Decided May 1, 1980.

John O. Pollard, Charlotte, N. C. (Blakeney, Alexander & Machen, Charlotte, N. C., on brief), for petitioner.

William M. Bernstein, N. L. R. B., Washington, D. C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., on brief), for respondent.

Hugh J. Beins, Washington, D. C., Thomas H. Kohn, Alexandria, Va., on brief, for intervenors Teamsters Local Union No. 391.

Before WIDENER, HALL and MURNAGHAN, Circuit Judges.

MURNAGHAN, Circuit Judge:

Teamster Local Union No. 39 ("Union"), the certified bargaining agent for certain employees of S & W Motor Lines, Inc. ("Employer"), complained of alleged violations by the Employer of §§ 8(a)(1), (2), (3), and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (2), (3), and (5). An administrative law judge ("ALJ") in a decision dated January 12, 1978, determined that some of the complaints had been made out, and others had not.

The ALJ's proposed order read:

Respondent, S & W Motor Lines, Inc., its officers, agents, successors and assigns shall:

1. Cease and desist from:

(a) Offering rewards and otherwise soliciting or encouraging nonstrikers to take physical retaliation against strikers.

(b) Granting bonuses to induce strikers to return to work.

**600**

(c) Soliciting grievances from its employees and indicating it [sic] consideration thereof and possible action thereon in order to discourage their support of Chauffeurs, Teamsters, & Helpers Local Union No. 391, Affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

(d) Encouraging employees to form their own unions instead of supporting Chauffeurs, Teamsters, & Helpers Local Union No. 391, Affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

(e) Encouraging the formation of, meeting with, and rendering aid and assistance to, the group referred to herein as the *ad hoc* employee group, or any like group, concerning grievances, wages, hours of employment, or other terms and conditions of employment.

(f) Refusing to bargain collectively with Chauffeurs, Teamsters, & Helpers Local Union No. 391, Affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, by failing and refusing to supply the said labor organization with information it requested on September 15, 1976, regarding non-unit employees, by encouraging employees to deal directly with Respondent in derogation of said labor organization, by unilaterally changing terms and conditions of employment of unit employees without bargaining with said labor organization and by refusing to bargain in good faith with said labor organization.

(g) In any manner interfering with, restraining or coercing employees in the exercise of rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action designed to effectuate the policies of the Act:

(a) Upon request, bargain collectively with the above-named Union as the exclusive exclusive [sic] representative of all its employees in the above-described unit concerning rates of pay, wages, hours of employment and other terms and conditions of employment, and embody any agreement reached into a signed contract, and furnish to said labor organization the information it requested on September 15, 1976, regarding non-unit employees.

(b) Reinstate overtime rates prevailing immediately before December 1, 1976, and pay its employees the sums of money representing the difference between what they would have earned after said date absent the unilateral change in overtime rates and what they actually earned with interest thereon computed as described under Section VI, entitled "The Remedy."

(c) Reinstate to their former jobs, or to a substantially equivalent position, without prejudice to their seniority and other rights and privileges previously enjoyed, within 5 days following their unconditional application to return to work those strikers who participated in the strike beginning October 16, 1976.

(d) Upon request of the above-named Union pay to any reinstated striker employed as an over-the-road truck driver the same per trip bonus paid to nonstriking drivers until the bonus paid the individual reinstated striker equals the average amount earned by the nonstriking drivers or until the cessation of such bonuses has been negotiated to agreement with the Union.

(e) Preserve and upon request make available to the Board or its agents for examination and copying all payroll records, social security payment records, timecards, personnel records, and reports to all records necessary to analyze the amounts due under the terms of this recommended Order.

(f) Post at its locations in Greensboro and Hickory, North Carolina, and Nitro and Parkersburg, West Virginia, copies of the attached notice marked "Appendix." Copies of the notice, on forms provided by the Regional Director for Region 11, after being duly signed by Respondent's authorized representatives, shall be posted by the Respondent immediately upon receipt thereof, and be maintained for 60 consecutive days thereafter, in conspicuous places, including all places where notices to employees are customarily posted. Reasonable steps shall be taken by Respondent to ensure that the notices are not altered, defaced, or covered by any other material.

(g) Notify the Regional Director for Region 11, in writing, within 20 days from the date of this Order, what steps Respondent has taken to comply herewith.

IT IS FURTHER ORDERED that as to allegations of the complaint not specifically found to have been violations of the Act herein be dismissed.

On June 15, 1978, a three-member panel of the National Labor Relations Board modified, and, as modified, affirmed the rulings, findings and conclusions of the ALJ, and modified, and, as modified, adopted his recommended Order. The modifications in the Order substituted:

A. For paragraph 1(b) the following:

Attempting to induce drivers to abandon their protected concerted activities by offering them bonuses to return to work. However, nothing herein shall be construed as permitting the Respondent to withhold any benefits previously granted to its drivers.

B. For paragraph 2(d) the following:

At the conclusion of the strike and upon request of the above-named Union pay to any reinstated striker employed as an over-the-road truckdriver the same per trip bonus paid to nonstriking drivers until the total bonus paid the individual reinstated striker equals the average amount earned by the nonstriking drivers during the strike or until the cessation of such bonuses has been negotiated with the Union. A driver reinstated prior to the end of the strike will have his bonus payments under the formula reduced by the amount he earned during the strike.

The Board panel also substituted a form of notice to be posted by the Employer, pursuant to its order, for the form of notice proposed by the ALJ.

Upon a review of the record, we are satisfied that the findings of the ALJ were supported by substantial evidence, and the Board order was consonant with those findings except in the following limited respects:

■ 1. After a strike had commenced, the Employer, without seeking to negotiate the matter with the Union, and, indeed, after dissimulating when questioned on the matter by the Union, instituted a special $50 per trip payment to non-striking over-the-road drivers, some of whom were members of the Union and all of whom were members of the bargaining unit. The asserted reason of the Employer was to meet a need for additional compensation supposedly generated by harassment visited on its drivers while on trips.

The ALJ found that the payments violated § 8(a)(1) of the Act since they interfered with, restrained or coerced employees in the exercise of their § 7 rights to organize, to bargain collectively through representatives of their own choosing and to engage in other concerted activity for the purpose of collective bargaining. The conclusion, though not compelled, was permitted by the evidence before the ALJ. *NLRB v. Rubatex Corp.*, 601 F.2d 147, 150 (4th Cir.), cert. denied, 444 U.S. 928, 100 S.Ct. 269, 62 L.Ed.2d 185 (1979); cf. *NLRB v. Aero-Motive Mfg. Co.*, 475 F.2d 27 (6th Cir. 1973).

■ The ALJ further determined that the $50 per trip payments constituted an attempt to bypass the selected bargaining representative and negotiate directly with employees in violation of § 8(a)(5). That conclusion is, in our view, untenable. A

strike was in progress, and it is apparent that the Union would have refused to approve special payments to non-striking workers. In this respect, the *Rubatex* and *Aero-Motive* cases, which upheld determinations that bonuses to non-striking workers were violations of § 8(a)(5) as well as § 8(a)(1), are distinguishable. The bonus payments there came after the strike was over and a new collective bargaining agreement had been signed. In those circumstances, the probability that the Union might have responded in some useful fashion was not so remote that it could be eliminated from consideration.

The rationale of *Rubatex* and *Aero-Motive* for upholding the findings of § 8(a)(5) violations was that negotiating would have opened an avenue for the union to call the illegality of the proposed bonuses to the employer's attention, with avoidance of the improper payments as a possible consequence. Such a view of matters makes sense when the possibility of paying bonuses arises after labor peace has been achieved, and availability of employees has been assured through execution of a new collective bargaining agreement. It is not realistic, however, where, as here, the Employer, in the midst of a strike, is struggling to keep his operations going, in the face of customer uneasiness over the uncertainty of service, and, as in the instant case, has experienced sabotage of equipment and other harassment, reasonably attributed by the Employer to activities of the strikers. In such circumstances, to have the payment of bonuses serve as the foundation for a failure to bargain finding, under § 8(a)(5), as well as for a finding of interference with collective bargaining rights under § 8(a)(1) would be unrealistic.

■ In the post-strike, post-new collective bargaining agreement situation dealt with in *Rubatex* and *Aero-Motive*, the illegality under § 8(a)(1) of any special payments to non-strikers is patent and indisputable. In the present case, however, the payments might or might not have been found by the ALJ to be justifiable. The record contained disputed evidence and we would have been obliged to sustain a finding either way. In other words, where the impropriety under § 8(a)(1) of the payments to non-strikers is incontestable from the very outset, they will support a finding of infringement of § 8(a)(5) as well. However, where the payments are made during a strike in circumstances making the issue of whether they are proper or not under § 8(a)(1) fairly debatable, they do not also support a finding of violation of § 8(a)(5). It would unreasonably subject the Employer to a responsibility to foresee what the NLRB's ultimate resolution of a possible § 8(a)(1) charge would be. Such *nunc pro tunc* treatment of the finding by the ALJ and its affirmance by the Board is inappropriate.

2. On September 15, 1976, the Union requested that the Employer provide certain information relating to layoffs of bargaining unit employees. The letter further stated:

I further request copies of layoff notices issued to non-bargaining unit employees which have been issued since the date of Thursday, September 2, 1976. In the event a formal letter was not used in the layoff of non-bargaining unit employees, a copy of the respective employee's temporary layoff form issued to the Employment Security Commission will suffice. I further request a complete list of the names, Social Security numbers, addresses, and date placed on layoff status of each non-bargaining unit employee who has been placed on layoff status since the date of Thursday, September 2, 1976.

The letter contained no justification for the request with respect to non-members of the bargaining unit nor any explanation of the purpose for which the information was sought. The Employer supplied the information sought relative to bargaining unit members, but refused the information requested with respect to non-members. The ALJ, affirmed by the Board, determined that § 8(a)(5) was infringed by the Employer's refusal to supply the information as to employees not in the bargaining unit. We

conclude that the decision and the order, to that extent, were erroneous.

■ When a union seeks information about non-members of the bargaining unit, when a prior collective bargaining agreement has expired and negotiations for a new one are not proceeding well, the possibility of improper motive on the part of the union cannot automatically be excluded. The employer reasonably may resist a request for information pertaining to persons who are not represented by the union, and, as to whom, absent special circumstances, the union has no business inquiring. While the employer's motivation in resisting expectably will predominantly center on its own desire to avoid dislocations and disturbances among employees not members of the bargaining unit, it may also derive in part from a justifiable concern for the welfare of such non-member employees and a desire to protect their rights of privacy.

■ Here the union asserted no reason why it needed the demanded information relative to non-bargaining unit employees. In the absence of a showing that it made any demonstration to the employer of a need to know, we are of the opinion that there was no unfair labor practice in the Employer's refusal to provide the information.

The conclusion is reinforced by contemplation of the reason advanced in this Court to support the Union's request. The Employer was taking the position before the state Employment Security Commission that laid-off employees who were members of the bargaining unit should be denied unemployment compensation, because of the expiration of the collective bargaining agreement and the attendant labor unrest. Contrarily, it conceded the right of non-members of the bargaining unit who were laid-off to benefits. It was the fact that such inconsistent positions were being taken, not the names, addresses and social security numbers of individual employees, which mattered to the Union. At oral argument, counsel for the Union freely admitted that the Union had no interest in knowing the social security numbers, and, given the purpose behind the Union's demand, the same evidently can be said of the names and addresses. The Employment Security Commission ruled against the Employer. That consideration, standing alone, does not establish fully the irrelevance of the particulars as to non-members, but it does reinforce the conclusion that, in the circumstances of this case, there was no need on the part of the Union to know.

In all other respects, the order is one as to which the application of the NLRB for enforcement will be granted, and the Employer's petition for review will be dismissed. To give effect to that conclusion, we deny enforcement to the following provisions of the NLRB order:

1. The portion of paragraph 1(f) reading: "by failing and refusing to supply the said labor organization with information it requested on September 15, 1976, regarding non-unit employees."

2. The portion of paragraph 1(f) reading: "by unilaterally changing terms and conditions of employment of unit employees without bargaining with said labor organization" to the extent the language extends to changes associated with payment of $50 trip bonuses.

3. The portion of paragraph 2(a) reading: "and furnish to said labor organization the information it requested on September 15, 1976, regarding non-unit employees.

4. The portion of paragraph 2(f) calling for posting of copies of the attached notice to the extent of the language in the attached notice reading:

a. "by refusing to bargain to provide it with the relevant information requested by it" [sic].

b. "bonuses and" in the phrase "with respect to bonuses and overtime rates."

It is ordered that enforcement be granted as provided in this opinion.

WIDENER, Circuit Judge, concurring and dissenting:

I concur in all of Judge Murnaghan's opinion except as it approves a finding of a § 8(a)(1) violation for payment of the $50 trip bonus to various drivers, and as to that part I respectfully dissent.

The opinion correctly recites the employer had experienced sabotage of equipment and other harassment reasonably attributed to the activities of the strikers. Violence, indeed, was rampant. The old contract had ended, and, while it is true that negotiations were being conducted concerning the terms of a new contract, I know of nothing in national labor law or policy which requires an employer to submit without opposition to sabotage, harassment, and violence by striking employees. If the sabotage, harassment, and violence were questionable, then I might join Judge Murnaghan's opinion and accept findings of fact as to those matters, but since they are admitted, I do not believe it can fairly be called an unfair labor practice under § 8(a)(1) of the statute to pay a bonus in order to keep operating in the face of admitted sabotage, harassment, and violence. The opinion, I suggest, puts a premium on violence.

K. K. HALL, Circuit Judge, concurring in part, and dissenting in part:

I.

I do not agree with the majority that an employer, caught up in the throes of economic uncertainty associated with a strike, should not be forced to raise a "foredoomed" issue for bargaining unless the alleged violation under § 8(a)(1) "is incontestable from the very outset." While the purpose behind this holding is apparently to protect employers from being punished twice, under both § 8(a)(1) and (5), for the good faith implementation of purportedly legal wage payments, I think this misconstrues the rationale underlying both *NLRB v. Rubatex*, 601 F.2d 147 (4th Cir. 1979), and

*Aero-Motive Mfg. Co.*, 195 NLRB 790 (1972), *enforced*, 475 F.2d 27 (6th Cir. 1973).

Although these opinions address the issue of *illegal* bonus payments made *after* the conclusion of a strike, the violations of § 8(a)(5) were found to exist because the employer, in each case, had circumvented the prescribed bargaining process and its potentially preventative effect on questionable, if not outright illegal, conduct.

As stated in *Aero-Motive*, the § 8(a)(5) requirement to bargain is applicable to both legal and illegal conduct:

> Not altogether infrequently, both in commercial negotiations and in labor negotiations, one party may propose to do something which he believes to be lawful, but which is not. Often the raising of the subject and the discussion of possible or probable illegality will dissuade the proposing party from pursuing his proposal further. . . .
>
> \*   \*   \*   \*   \*   \*
>
> We are therefore of the view that the *raison d'etre* of requiring bargaining in advance of changes in wages has at least as much application to proposed illegal changes as to legal ones. And so we find [the] unilateral action in paying the bonus to have been a violation of Section 8(a)(5). . . .

*Aero-Motive* at 792. In *Rubatex*, we expressly rejected the contention, now adopted by the majority, that "it would be futile to require it to bargain over payments which the union would not accept." *Rubatex* at 150.

Recognizing that the purpose of the bargaining requirement is to provide a forum for candid, working discussions of all issues affecting the negotiating parties, the ALJ in the present case relied on *Aero-Motive* and properly held that "[e]ven if it could be expected that the Union would not agree to the proposal the Union may have persuaded Respondent against its unlawful course. In any event, it has never been the law that an employer may embark upon unilateral ac-

tion simply because it may be predicted that the Union would not agree to the employer's proposed action."

The NLRB, in adopting the ALJ's conclusion, adhered to the general principle that the unilateral granting of bonuses to employees *during* negotiations without consulting with the bargaining representative violates § 8(a)(5). *See, e. g., NLRB v. Union Mfg. Co.*, 179 F.2d 511 (5th Cir. 1950).[1] There is nothing in either *Rubatex* or *Aero-Motive* to support a departure from this established rule in favor of a more narrowly drawn statement that only post-strike, clear-cut violations of § 8(a)(1) will permit a finding of illegality under § 8(a)(5).

The majority decision seriously undermines the prophylactic effect of § 8(a)(5) and disregards well-reasoned precedent to the contrary. I would affirm the finding that the illegal bonus payments violated § 8(a)(5) of the Act.

## II.

After protesting to the company that union members were being laid off in retaliation for the union's bargaining position in contract negotiations, the union had asked for layoff information[2] pertaining to both bargaining and non-bargaining unit employees for the two months preceding the strike. This information was needed to confirm allegations that the company had issued different layoff notices to non-union employees to enable them to draw unemployment compensation.[3] The company orally responded to the union's letter at a bargaining session on September 24, 1976, and refused to furnish the data, asserting

that the union was not entitled to it. The union apparently did not further attempt to justify the request.

The ALJ found that the employer's refusal to furnish the layoff data had violated § 8(a)(5) of the Act by failing to provide information requested by the bargaining representative for the proper performance of its duties. The majority, however, holds that, based on welfare and privacy interests, an employer may properly refuse to provide information concerning non-bargaining unit members unless the union first demonstrates to the employer a "need to know."

It is well established that an employer has a statutory obligation to provide relevant information needed by a union to perform its duties effectively, and that the failure to provide such information constitutes a refusal to bargain in violation of § 8(a)(5). *NLRB v. Acme Industrial Co.*, 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967); *Cone Mills Corp. v. NLRB*, 413 F.2d 445 (4th Cir. 1969); *NLRB v. Whitin Machine Works*, 217 F.2d 593 (4th Cir. 1954). The majority, in creating a separate "need to know" requirement apart from this governing standard of relevance, overlooks the fact, as stated in *Curtiss-Wright Corp. v. NLRB*, 347 F.2d 61, 69 (3rd Cir. 1965), that "necessity is not a separate and unique guideline, but is directly related to the relevance of the requested data."

Wage data and other information concerning bargaining unit employees is presumed to be relevant, whereas information relating to employees outside the bargaining unit must be shown to be relevant to

---

1. *John L. Clemmey Co.*, 118 NLRB 599 (1957); *DeDiego Taxi Cabs, Inc.*, 107 NLRB 1026 (1954).

2. In a letter to the company dated September 15, 1976, and entitled "Re: Contract Negotiations and NLRB Charges," the union had requested copies of all layoff slips and "a complete list of the names, Social Security numbers, addresses, and date placed on layoff status of each non-bargaining unit employee. . . ."

3. On the same day as the union request, the idled union employees appeared at a hearing of the state Employment Security Commission to protest the company's assertion that they had been laid off because of a labor dispute and were therefore not entitled to unemployment benefits. On October 1, 1976, the Special Appeals Deputy ruled in favor of the employees, and his decision was adopted by the Commission on May 25, 1977.

bargainable issues. *NLRB v. Western Electric, Inc.,* 559 F.2d 1131 (8th Cir. 1977); *San Diego Newspaper Guild v. NLRB,* 548 F.2d 863 (9th Cir. 1977); *NLRB v. Rockwell-Standard Corp.,* 410 F.2d 953 (6th Cir. 1969); *Curtiss-Wright Corp. v. NLRB, supra.*

Although the union had the initial burden of showing the relevancy of information concerning non-bargaining unit employees, in this case any requirement that the bargaining representative formally express the reason for requesting the information elevates form over substance. The company, in refusing to supply the layoff data regarding non-bargaining unit members, was well aware of the reason underlying the particular request. Indeed, it provided such information regarding bargaining unit employees without challenging the presumption of relevancy which attaches when the data relates to members represented by the union. Rather, the basis for its refusal was the assertion that the union was not entitled to it because the information would be used to deprive the non-bargaining unit employees of the unemployment benefits being denied to bargaining unit members.

Admittedly, the letter seeking the layoff data did not expressly state a reason for the request. In this respect, the request did not technically meet the relevancy standard. However, in view of the contemporaneous Commission hearing, the numerous claims of unfair labor practices, and the heading of the letter seeking the layoff data, *supra,* n.2, the information was clearly relevant in alleging discriminatory treatment of employees solely due to union representation. The purpose for requiring a showing of relevancy, which allows an employer to protect non-bargaining unit members by determining the validity of an informational request regarding such employees, is clearly met in a situation such as this.

The majority reasons that "[i]t was the fact that such inconsistent positions were being taken, not the names, addresses and social security numbers of individual employees, which mattered to the Union." The union's admission at oral argument that the social security numbers were not needed is then extended to include names and addresses as well. Finally, the fact that the Employment Security Commission ruled in favor of the bargaining unit employees is also relied on to support the inference that the requested information was not really needed.

The outcome of the Commission hearing has no bearing whatsoever on the statutory duty of the employer to supply the requested information. At least the names, and possibly the addresses, of the non-bargaining unit employees would obviously be relevant in substantiating either the claim before the Commission or an unfair labor practice charge, although the company could probably refuse to divulge social security numbers unless their relevancy were shown.

By sanctioning such managerial footdragging under the guise of protecting non-bargaining unit employees, the majority impairs the ability of bargaining representatives to weed out a substantial number of unmeritorious complaints without needlessly resorting to a full-fledged inquiry by the NLRB. According, I would affirm the finding of a violation of § 8(a)(5) for the refusal by the company to furnish at least the names of non-bargaining unit employees who were laid off during the specified period.

I concur with the remaining aspects of the majority opinion.